James COVINGTON, Appellant,

v.

David W. HARRIS, Appellee.

No. 21935.

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 5, 1968.

Decided March 14, 1969.

Mr. Thomas C. Green, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the motion, for appellee.

Mr. Charles R. Halpern, with whom Mr. Stephen B. Rosenberg was on the opposition to the motion, for appellant.

Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and McGOWAN, Circuit Judge.*

BAZELON, Chief Judge:

The District Court heard and dismissed appellant's habeas corpus petition seeking transfer from the maximum security pavilion of Saint Elizabeths Hospital to some less restrictive ward. On this appeal appellant not only contests this order, but also asserts that he is entitled to be released from Saint Elizabeths altogether because of numerous alleged defects in the proceedings leading to his civil commitment. Appellee promptly moved for summary affirmance on the grounds that the record adequately supports the order denying transfer and that none of the other issues appellant now raises was presented below. Thereupon, appellant requested summary reversal on the transfer issue and further argument on the others. Because of deficiencies in the record, we think a remand, rather than any final disposition, would best serve the interests of justice.

### I

Appellant was convicted of second degree murder in 1942 and served a 14-year prison sentence. In 1957, soon after his release, he was again charged with murder. This time he was found incompetent to stand trial because of "mental deficiency [38 I. Q.] with psychotic reaction," and was confined in Saint Elizabeths. In 1964, he was civilly committed to the hospital, and the pending murder charge was dismissed. Ever since his original confinement he has been continuously lodged in the John Howard (maximum security) Pavilion. Though his I. Q. has risen to 52, the hospital says he is still suffering from the same syndrome.

Generally, during his ten years in John Howard, appellant has by all accounts been a model patient, cooperating with the staff and staying out of trouble. Under the influence of medication he has shown no overt signs of violence. In December, 1966, while under an experimentally reduced dosage of medication, he confessed to having "murderous thoughts" towards some of his fellow patients, but these thoughts were stilled by restoring his full dosage. Considering this record and the improvement he had shown during confinement, his supervising physician, Dr. Weickhardt, recommended in September, 1967, that he be transferred out of the maximum security division. The recommendation was disapproved by Acting Superintendent Harris, whereupon appellant brought this habeas corpus action in the District Court *pro se*, explaining that he "would like to get out on the grounds where I have ground privileges and catch a little fresh air."

In a hearing before Judge Sirica, Dr. Weickhardt stood by his recommendation, stating that while appellant would never achieve normal intelligence,

> as long as he takes medicine such as he is getting now—a tranquilizer— and as long as he refrains from the use of alcohol, I think that he can get along well under supervision.

The doctor had been unable, however, to convince the Superintendent that appellant, if permitted more freedom, might not begin to use alcohol, with "unpredictable consequences." The hospital thought it more prudent to wait a full year after the "murderous thoughts" episode before risking a less restrictive régime. Judge Sirica complained that he

---

* Circuit Judge McGowan did not participate in the decision to remand this case.

couldn't see "why the Superintendent doesn't accept the advice of the doctor that sees this man all the time," but decided to continue the case until the hospital had reconsidered the transfer recommendation in December as scheduled, at the end of the year of "murderous thoughts."

The hospital did not reconsider its decision; indeed, it may not have even formally reconsidered appellant's request.[1] Accordingly, appellant was back in court in February, 1968, before Judge Hart. But Dr. Weickhardt now reversed his field and refused to recommend a transfer. In the unkindest cut of all, the doctor said the reason for his change of heart was an incident in which appellant reported that another patient had stolen money from him. The authorities searched the accused patient and found five dollars and some contraband drugs, including pills and a pink liquid. This discovery set in motion a train of inferences which, according to Dr. Weickhardt, were cumulatively fatal to appellant's hopes. Appellant's medication was a pink liquid. And though other medicinal liquids administered in the pavilion were also pink, though no analysis was performed on the confiscated drug to determine if it could have been appellant's, though appellant testified that he was never given any pills and that he was always obliged to swallow his pink liquid in the presence of an attendant— nonetheless Dr. Weickhardt concluded from the discovery of pills and pink liquid on the thief that "there was reason to think there had been some dealings between [appellant] * * * and the other patient about money and drugs." Moreover, it appears that,

while not uncommon, money itself is formally contraband in John Howard Pavilion. Appellant said he had found the money in the courtyard where others had been gambling, but that he had inadvertently neglected to turn it in, though he knew he should have done so. Despite the fact that, if he had willfully violated the rules, he was of course only incriminating himself by reporting the theft, Dr. Weickhardt concluded that

> if Mr. Covington cannot follow the regulations about contraband in the Maximum Security Building * * *, he would be even less inclined to follow them where there is less supervision.

Finally, the doctor noted that appellant had in 1942 committed murder after an altercation over a small sum of money. He conceded that appellant's behavior in calmly reporting the instant money incident was, in contrast, "much to his credit," but he surmised that the Superintendent "felt there might be a possibility that things like this would happen again between him and another patient. * * *"

On this evidence, the court dismissed the petition, relying on the Superintendent's initial decision to deny transfer, a decision now unopposed by any medical authority.

## II

On its motion for summary affirmance, appellee does not deny that appellant may seek transfer out of John Howard Pavilion via habeas corpus. It is well settled that habeas corpus challenges the place as well as the fact of confinement,[2] even if the challenged place is a particular hospital ward,[3] and

---

1. Appellant's hospital records, lodged with this court on appeal (but not presented to the District Court) make no mention of appellant's request for transfer after the September 1967 decision to wait until December. It may be, however, that the records are not a complete set since, though they were not filed until December 4, 1968, the last entry is dated December 31, 1967.

2. In re Bonner, 151 U.S. 242, 14 S.Ct. 323, 38 L.Ed. 149 (1894); Lake v. Cameron, 124 U.S.App.D.C. 264, 364 F. 2d 657 (1966) (en banc), cert. denied, 382 U.S. 863, 86 S.Ct. 126, 15 L.Ed.2d 100; Miller v. Overholser, 92 U.S.App. D.C. 110, 206 F.2d 415 (1953).

3. Miller v. Overholser, *supra* note 2.

specifically if the particular ward is the John Howard Pavilion.[4]

█ Rather, appellee says that under the standard governing judicial review of hospital decisions concerning internal administration articulated in Tribby v. Cameron,[5] the question is not whether the hospital has made the best decision, but only whether

> it has made a permissible and reasonable decision in view of the relevant information and within a broad range of discretion.[6]

Appellee submits that since the District Court implicitly found the hospital's decision "permissible and reasonable," and since this finding is not "clearly erroneous," there is no substantial issue for appellate determination. Appellant, on the other hand, asserts that the hospital manifestly failed to carry its burden of proof and that he is therefore entitled to summary reversal.

█ We agree with appellee that *Tribby* states the applicable standard of judicial review. But the predicate for the hospital's "wide range of discretion" under *Tribby* is a record which gives assurance that its decision has been made "in view of the relevant information." We cannot tell from the present record whether such information was considered or not. Accordingly, since neither of the parties objects to clarification of the record,[7] we remand to the District Court for further proceedings to expand the record and to make findings of fact. The scope of the proceedings on remand required by this opinion are accurately delineated by Judge Fahy at page 630.[8]

### III

█ A "permissible * * * decision" under Tribby v. Cameron[9] is one which demonstrably takes account of "the relevant information." The principal purpose of limited judicial review of administrative action is to insure that the decision-makers have (1) reached a reasoned and not unreasonable decision, (2) by employing the proper criteria, and (3) without overlooking anything of substantial relevance. More than this the courts do not pretend to do, and probably are not competent to do. To do less would abandon the interests affected to the absolute power of administrative officials.

█ Not only the principle of judicial review, but the whole scheme of American government, reflects an institutionalized mistrust of any such unchecked and unbalanced power over essential liberties. That mistrust does not depend on an assumption of inveterate venality or incompetence on the part of men in power, be they Presidents, legislators, administrators, judges, or doctors. It is not doctors' nature, but human nature, which benefits from the prospect and the fact of supervision. Indeed, the limited scope of judicial review of hospital decisions necessarily assumes the good faith and professional expertise of the hospital staff. Judicial review is only a safety catch against the fallibility of the best of men; and not the least of

4. Stultz v. Cameron, 127 U.S.App.D.C. 324, 383 F.2d 519, 520–521 (1967) (en banc).

5. 126 U.S.App.D.C. 327, 379 F.2d 104 (1967).

6. *Id.* at 328, 379 F.2d at 105.

7. In the alternative, appellant urges us to remand for a supplemental record on the transfer question, and during oral argument the Government stated that it "would have no objection if the court felt that a remand would be in order to take more evidence on this issue."

8. Cf. Stultz v. Cameron, *supra* note 4; Rouse v. Cameron, 125 U.S.App.D.C. 366, 374, 373 F.2d 451, 458 (1966); Miller v. Overholser, *supra* note 2. In *Miller*, we remanded a similar assertion of a right to transfer within Saint Elizabeths
> with instructions that it make a finding as to the conditions of appellant's confinement, receiving, if necessary, additional pleadings and evidence in that regard * * *. *Id.* at 116, 206 F.2d at 420.

9. *Supra* note 5.

its services is to spur them to double-check their own performance and provide them with a checklist by which they may readily do so.

The hearing below dealt almost exclusively with the single issue of appellant's potential dangerousness to others. The question, however, was not whether appellant was dangerous enough to require continued confinement, but whether he could properly be confined under conditions of maximum security detention. That question appears to involve other considerations besides his abstract potential dangerousness.

### A. Consequences of Confinement in John Howard Pavilion.

■ A mere request for a change of dormitories or for transfer between substantially similar wards could not support a petition for habeas corpus. A patient seeking review of his placement within the hospital must show at least that there are substantial differences in the conditions of confinement between where he is and where he wants to be. We need not decide whether or when such a showing could be made on a request for transfer from a service other than John Howard. Appellant's petition alleges in substance only that he has a right to be kept anywhere but in John Howard, and the necessary premise of such a petition

is that John Howard is a unique service at Saint Elizabeths.

It appears that John Howard houses principally the so-called "criminally insane." [10] Such facilities have, in the past, notoriously rivalled maximum security prisons in the pervasiveness of their restraint upon liberty and the totality of their impositions upon dignity. The predecessor to John Howard Pavilion at Saint Elizabeths was described to this court as

> a place for the confinement of the violent, criminal, hopeless insane, instead of * * * a place designed and operated for the treatment of the mentally ill. * * * [11]

Of the present John Howard, appellant says in his brief:

> John Howard is *physically* a prison. Its inmates are locked in; they have no ground privileges, their outdoor activities are conducted in a walled-in yard identical to a prison yard; their visitors may be received only for a few minutes, and then in a prison-like visiting room; and they are denied access to many of the recreational and educational facilities available to other patients at the hospital.

Thus, there is reason to believe that confinement in John Howard is not normally contemplated for civilly committed pa-

---

10. This designation refers to persons who have not been civilly committed but are rather confined as a result of criminal proceedings, either because they are incompetent to stand trial for pending charges or because they have been found not guilty by reason of insanity of a criminal offense. In 1963, John Howard's population was comprised of "essentially all prisoner patients." Hearings on the Administration and Operation of Saint Elizabeths Hospital before a Subcommittee of the House Committee on Education and Labor, [hereinafter "1964 Hearings"] 88th Cong., 1st Sess. 65 (1964) (testimony of Dr. Dale C. Cameron, Superintendent of Saint Elizabeths Hospital). Of the 380 patients then in John Howard, only thirty were "civil" patients (of which the hospital then housed some 6000), and those few

were there because they were "difficult and assaultive." *Id.*, 48.

A more recent description of John Howard, with recommendations for its improvement, is contained in the report of an ad hoc committee of the National Institute of Mental Health ("The Evaluation of Security Programs and Facilities at Saint Elizabeths Hospital," November 1968), portions of which are attached as an Appendix to this opinion.

11. Miller v. Overholser, *supra* note 2, 92 U.S.App.D.C. at 116, 206 F.2d at 419. In Baxstrom v. Herold, 383 U.S. 107, 113, 86 S.Ct. 760, 15 L.Ed.2d 620 (1964), the Supreme Court took note of the "striking" dissimilarities between Dannemora—the New York hospital for the "criminally insane"—and New York's "civil" hospitals.

tients and entails extraordinary deprivations of liberty and dignity which make it, in effect, more penitentiary than mental hospital, even if it also provides some treatment.

    In entertaining appellant's petition, the District Court evidently proceeded on the reasonable assumption that, as the designation "maximum security service" implies, confinement in John Howard does in fact impose substantially greater deprivations than confinement anywhere else in the hospital. However, appellant made no record on this matter except to note that he was denied ground privileges. We do not dispute the District Court's assumption concerning the nature of John Howard. Indeed, our further observations concerning the inadequacy of the record rest on the same assumption. However, since Congress and the courts are only beginning to examine the operations of Saint Elizabeths,[12] it is desirable that the courts be fully informed by the parties. A court is better equipped to review a hospital decision that exceptional restrictions on liberty are justified if it knows with reasonable precision what those restrictions are.

    The facts about the nature of John Howard Pavilion are not peculiarly within the knowledge of the hospital, and were properly part of appellant's case below. On remand, he may now develop those facts for the record. If they are as he now says, then before denying appellant's request for transfer the hospital was obliged both to canvass less restrictive alternatives and, finding none, to consider the effect of such extreme deprivations on his treatment.

### B. The Availability of Less Restrictive Alternatives.

    In Lake v. Cameron,[13] we held that in reviewing on habeas corpus a civilly committed patient's confinement in a mental hospital, the court should satisfy itself that no less onerous disposition would serve the purpose of the commitment. We thought this principle was implicit in the provisions of the District of Columbia Hospitalization of the Mentally Ill Act[14] authorizing the committing court to consider alternatives to hospitalization[15] and evincing a profound congressional concern for the liberties of the mentally ill. The new legislation apart, however, the principle of the least restrictive alternative consistent with the legitimate purposes of a commitment inheres in the very nature of civil commitment, which entails an extraordinary deprivation of liberty justifiable only when the respondent is "mentally ill to the extent that he is likely to injure himself or other persons if allowed to remain at liberty."[16] A statute sanctioning such a drastic curtailment of the rights of citizens must be narrowly, even grudgingly, construed in order to avoid deprivations of liberty without due process of law.[17]

    The principle of the least restrictive alternative is equally applicable to alternate dispositions *within* a mental hospital. It makes little sense to guard

---

12. *See, e.g.,* Hearings before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary on a Bill to Protect the Constitutional Rights of the Mentally Ill, 88th Cong., 1st Sess. 12 (1963); 1964 Hearings, *supra* note 10.

13. 124 U.S.App.D.C. 264, 364 F.2d 657 (1966).

14. D.C.Code §§ 21–501 to 21–591 (1967).

15. D.C.Code § 21–545(b) (1967).

16. D.C.Code § 21–544 (1967).

17. *Cf.* Aptheker v. Secretary of State, 378 U.S. 500, 514, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964). It is an axiom of due process that

    even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose.

Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960).

zealously against the possibility of unwarranted deprivations prior to hospitalization, only to abandon the watch once the patient disappears behind hospital doors. The range of possible dispositions of a mentally ill person within a hospital, from maximum security to outpatient status, is almost as wide as that of dispositions without. The commitment statute no more authorizes unnecessary restrictions within the former range than it does within the latter.

The only distinctive feature of intra-hospital dispositions suggesting that they might be subject to a different rule is the fact that they involve considerations of hospital administration which are entrusted, in the first instance, to hospital authorities. Efficient hospital administration does require the courts to accord the administrators much broader discretion in determining the appropriateness of an intra-hospital disposition than in assaying the need for hospitalization *ab initio*. But this recognition of the hospital's primary responsibility, reflected in the narrow scope of judicial review under Tribby v. Cameron,[18] does not detract from the principle that additional restrictions beyond those necessarily entailed by hospitalization are as much in need of justification as any other deprivations of liberty; nor does it preclude all judicial review of internal decisions.

In the 1964 Act,[19] Congress scotched any notion that a public mental hospital is a temple into which mere mortals are not allowed to gaze. It marched rudely into the very sanctum sanctorum, where purely medical decisions are made, and established a judicially cognizable right to treatment.[20] It instructed the hospital to keep detailed records of all treatment administered, and to make them available

to the patient's personal physician or attorney upon his request.[21] It provided for periodic reconsideration—by the hospital, by outside physicians, and by the courts—of the need for hospitalization itself.[22] It even prescribed in detail when and how the hospital might control incoming mail and other communications to a patient,[23] and it felt compelled to affirm expressly that the hospital still retains the right to make "reasonable rules regarding visitation hours and the use of telephone and telegraph facilities." [24] These pervasive limitations on the hospital's discretion to run its own shop negate any intent to repeal in the same statutory breath the ordinary presumption in favor of liberty or to insulate the hospital from all accountability for its protection of that right.

Thus, before a court can determine that the hospital's decision to confine a patient in a maximum security ward is, within its broad discretion, "permissible and reasonable * * * in view of the relevant information," [25] it must be able to conclude that the hospital has considered and found inadequate all relevant alternative dispositions within the hospital. Moreover, as we noted in Lake v. Cameron, the state has the obligation

to bear the burden of exploration of possible alternatives an indigent cannot bear * * *. Appellant may not be required to carry the burden of showing the availability of alternatives. Proceedings involving the care and treatment of the mentally ill are not strictly adversary proceedings. Moreover, appellant plainly does not know and lacks the means to ascertain what alternatives, if any, are available, but the government knows or has the means of knowing and

18. *Supra* note 5.

19. *Supra* note 14.

20. D.C.Code § 21–562 (1967); Rouse v. Cameron, *supra* note 8.

21. *Id.*

22. D.C.Code §§ 21–546, 21–547, 21–548 (1967).

23. D.C.Code § 21–561(a) and (b) (1967):

24. D.C.Code § 21–561(c) (1967).

25. Tribby v. Cameron, *supra* note 6.

should therefore assist the court in acquiring such information.[26]

The duty to explore intra-hospital alternatives to maximum security confinement can hardly be assailed as an intolerable burden on the administrators. Professionally, a doctor owes even a voluntary patient a careful canvass of alternatives to drastic treatment. He owes at least as much to a patient confined for treatment against his will.

The instant record is devoid of evidence that an evaluation of alternatives was made. At most it shows that the hospital thought appellant should be closely supervised for the protection of others. In ten years, he has never been violent or unruly.[27] Under full medication, he has not even expressed "murderous thoughts," and medication may of course be administered outside a maximum security ward. Appellant asserts that the hospital has other security wards, not imposing the extreme deprivations of the John Howard Pavilion, in which supervision can be provided. These wards may not be suitable for appellant, but the record does not disclose a reasoned hospital conclusion that they are not. On remand, the hospital will have an opportunity to show that it has considered alternative security accommodations for appellant and to explain why it finds them inadequate.

### C. Relation of Confinement to Treatment.

Under present law, the principal justification for involuntary hospitalization is the prospect of treatment, and a failure to provide treatment would present "serious constitutional questions."[28] Accordingly, Congress has provided that

A person hospitalized in a public hospital for a mental illness shall, during his hospitalization, be entitled to medical and psychiatric care and treatment.[29]

Under that provision, the hospital may be required to show that it is making "a bona fide effort" to cure or improve the patient, and that the treatment provided "is suited to his particular needs." [30]

Appellant does not contend that he has been denied his statutory right to treatment. But since treatment is an essential justifying purpose of any civil commitment, a "permissible * * * decision" to confine a patient under maximal restrictions cannot be made without consideration of its therapeutic consequences. That the conditions of confinement may significantly enhance or retard a given patient's recovery is not open to doubt.

The milieu of the hospital, if properly structured, is * * * a constructive force for getting well; if improperly constructed it is a force for remaining sick.[31]

It may not "be assumed that confinement in a hospital [or in its maximum security ward] is beneficial 'environmental therapy' for all." [32] Even if in some cases maximum security confinement is positively therapeutic, such cases may be exceptional. Whatever the method of treatment applied, the ultimate goal of therapy for persons involuntarily hospitalized must be to shore up their capacity to function satisfactorily in the unrestricted environment of the outside world. It appears that this goal is unlikely to be achieved if the patient has little or no opportunity for controlled

---

26. *Supra*, note 13, 124 U.S.App.D.C. at 267–268, 364 F.2d at 660–661.

27. Indeed, appellant's hospital records show that he has regularly been permitted to work with large knives and other sharp instruments in the hospital broom shop.

28. Rouse v. Cameron, 125 U.S.App.D.C. 366, 370, 373 F.2d 451, 455 (1967).

29. D.C.Code § 21–562 (1967).

30. Rouse v. Cameron, *supra* note 28, 125 U.S.App.D.C. at 371, 373 F.2d at 456.

31. 1964 Hearings, *supra* note 10, 23–24 (Testimony of Superintendent Dr. Dale C. Cameron).

32. Rouse v. Cameron, *supra* note 28, 125 U.S.App.D.C. at 371, 373 F.2d at 456.

experiments with freedom. Accordingly, civilly committed patients are rarely sent to John Howard Pavilion at all,[33] and the typical treatment program at Saint Elizabeths for those few who are housed there envisages transfer into a progressively less restrictive regime.[34]

It may be that appellant benefits therapeutically from maximum security confinement, or that in his case such confinement is therapeutically neutral, or that, though an obstacle to the most rapid progress, its detrimental effects on his treatment are outweighed by the need to protect other patients or to prevent his escape. Any of these possibilities could adequately explain the hospital's decision, but the record contains no hint as to which one, if any, explains it in fact. For all that appears, the hospital may have considered only appellant's dangerousness and ignored his treatment needs. Such a one-sided balance would inevitably resolve all doubts against greater freedom. Moreover, since a proper balance often involves comparative evaluation of unquantifiable variables, intelligent judicial review requires at least a reasoned hospital analysis of any conflict among them. Because the record contains no such analysis, it provides no assurance that the hospital considered "the relevant information."

For the same reasons that he cannot be required to establish the availability of less restrictive alternatives, appellant cannot reasonably be obliged to bear the burden of attacking the hospital decision on medical grounds *in vacuo*. On remand, the hospital should explain either why maximum security confinement does not impair appellant's prospects for the promptest rehabilitation, or that he is so dangerous as to require such impairment.

### D. Appellant's Hospital Records.

Appellant has sought leave to file his hospital records with this court. In D.

C.Code § 21–562, Congress expressly provided that

> The administrator of each public hospital shall keep records detailing all medical and psychiatric care and treatment received by a person hospitalized for a mental illness and the records shall be made available, upon that person's written authorization, to his attorney or personal physician. The records shall be preserved by the administrator until the person has been discharged from the hospital.

Plainly, appellant's attorney could have introduced these records into evidence. His failure to do so might not be cause for a remand if the record were otherwise adequate, but the fact that the District Court had to conduct its review without benefit of them is an additional reason for requiring further consideration.

Even if appellant had deliberately chosen not to introduce his records, however, the hospital could have used them to explain its decision. That it may not disclose them to outside parties without the patient's consent does not imply that it is forbidden to introduce them in court where they are relevant to the patient's contentions on habeas corpus. One plain purpose of the statutory records requirement is to facilitate judicial review of the care and treatment accorded the patient.[35] A petitioner may not use the confidentiality of his records as a sword to deprive the court of the enlightenment the records requirement was designed to give it. The records submitted on this appeal are not notably informative, but there may well be other records, and even the limited material now available throws some light on the hospital's thinking.

In view of its prerogative to introduce such records, the hospital's obligation to show that a challenged decision

---

33. See note 10, *supra.*

34. 1964 Hearings, *supra* note 10, 22, 49 (Testimony of Superintendent Dr. Dale C. Cameron).

35. See Rouse v. Cameron, *supra* note 28, 125 U.S.App.D.C. at 370–371, 373 F.2d at 455–456.

reflects a reasoned consideration of the relevant information should not ordinarily be burdensome for either the hospital or the courts. Even if the records are inadequate in the present case, full records kept in the spirit of the statutory requirement would usually be sufficient in themselves to fulfill the hospital's evidentiary obligation. By articulating a plan of treatment and by explaining the basis for important decisions affecting the patient, they would fully inform the court at a glance. Incidentally, they would also enhance the integrity, reliability, and thoroughness of the hospital's own decision-making procedures. The bothersome incidental paperwork is a small price to pay for so many blessings. Besides, such paperwork is often bothersome precisely because the process of formal articulation forces busy administrators to confront problems and considerations their intuitive reactions might have overlooked.

As we suggested in Rouse v. Cameron,[36] if the hospital established internal procedures for reviewing its own decisions and redressing grievances it could largely eliminate any occasion for judicial challenges, and any residual litigation could be readily disposed of on summary judgment. Expert administrative agencies of the federal government which deal primarily with property, not with lives and liberties, follow such procedures as a matter of course, in order to maintain consistent policies and to correct their own errors. Largely because they do so, the courts rarely disturb their decisions for other than procedural infirmities.

IV

In these respects, then, the record is inadequate to show whether the hospital made a "permissible decision" to keep appellant in John Howard Pavilion "in view of the relevant information."[37] Accordingly, we do not consider wheth-

er that decision is, on the present record, "reasonable * * * within a broad range of discretion." However, it may be useful to the parties and the court on remand to flag several troublesome issues raised by the record and by appellant's hospital dossier, which was not introduced below.

First, the considerations passed by in silence at the hearing below are all possible counterweights to the consideration of appellant's potential dangerousness. The danger feared in this case is not one lightly to be dismissed, and we do not suggest that it could never outweigh all other considerations. But as we recently made clear in Millard v. Harris,[38] "dangerousness" is a many splendored thing. Unless muzzled by discriminating analysis, it is likely to weigh against nominally competing considerations the way a wolf weighs against a sheep in the same scales: even if the sheep is heavier when weighed separately, somehow the wolf always prevails when the two are weighed together. Keeping dangerousness on a taut leash is especially difficult where there is danger of murder, since the danger is admittedly grave and since its improbability, which theoretically discounts its gravity, is exceedingly difficult to quantify.

Moreover, once a man has shown himself to be dangerous, it is all but impossible for him to prove the negative that he is no longer a menace. The specters of the murder appellant committed 35 years ago (expiated by a long jail sentence) and the murder he may have committed more than 10 years ago obviously haunt the hospital at the very thought of granting him the least measure of freedom within Saint Elizabeths. He asks for ground privileges after ten docile years under a regime consisting, according to the hospital files, of maximum security confinement, pink liquids, and a dozen brief psychiatric interviews; and the hospital worries about those

---

36. *Id.* at 371 n. 22, 373 F.2d at 456 n. 22.

37. Tribby v. Cameron, *supra* note 6.

38. 132 U.S.App.D.C. 146, pp. 151–153, 406 F.2d 964, 969, 971 (1968).

murders and the "unpredictable consequences" which would ensue if he should ever have access to alcohol. Their concern is understandable and may well be fully justified. But for all that appears, the murders and the unpredictable consequences will still be there after twenty years or after fifty. Appellant was not convicted of the second murder, and his hospitalization is not to be tacitly converted into a life sentence to John Howard.

In these circumstances it is fair to ask the hospital how appellant can ever demonstrate his readiness for a less pervasive confinement: What evidence of improvement are they looking for? What is the prospect that they will ever find it? If, as may be, the hospital administrators think he will likely *never* be sufficiently purged of his dangerousness, then the reviewing court should at least have an opportunity to scrutinize the basis for such a counsel of despair. For the very reason that he is unlikely soon, if ever, to be released from the hospital, it is crucial to provide some check against his becoming a non-person, deprived of any rights to minimally rational treatment within the hospital because he murdered once and may have murdered again.

Second, there is some indication that the hospital denied transfer for reasons other than simple dangerousness. The hospital records suggest that appellant's request may have been initially deferred, not because he was inherently a bad risk, but because no space was available in other wards where he could be adequately supervised.[39] The hospital cannot, of course, create space it does not have, but if appellant is in John Howard merely *faute de mieux*, serious questions arise as to hospital priorities and constitutional and statutory rights.[40] Moreover, the hospital may have seized upon Dr. Weickhardt's change of heart as a sufficient reason not even to reconsider its postponed decision.[41] If so, Dr. Weickhardt's analysis of the episode involving the theft of appellant's money assumes disturbing importance. His explanation does not convincingly lay to rest the possibility either that appellant's request for transfer was denied as a disciplinary measure to enforce minor hospital rules, or else that the money episode served as a pretext under which other undisclosed interests could be served. The public, the court, the hospital, and not least the appellant, would profit greatly from a thorough ventilation of these matters and a careful attention to the legitimacy of the considerations which prove to have been crucial.

V

Quite apart from the transfer issue, appellant now contends for the first time that his civil commitment in 1964 was fatally defective in numerous respects. He says he was denied his statutory right to an independent judicial evaluation of his mental condition and need for commitment, since the committing court had before it no information on which to predicate such an evaluation. He also says this defect amounts to a denial of due process. Furthermore, he alleges deprivations of the statutory right to a jury trial, the alleged right to a transcript of his pre-commitment hearing before the Mental Health Commission, and the constitutional right to effective representation of counsel.

---

39. In deferring action on the original recommendation that appellant should be transferred, Acting Superintendent Harris wrote:

> All agree that his initial supervision [outside John Howard] must be very dependable for the first few months of his security reduction. At this moment there is no service available for his placement that can provide the needed close attention.

No mention of this consideration was made at either of the court hearings, however.

40. See Rouse v. Cameron, *supra* note 28, 125 U.S.App.D.C. at 372–373, 373 F.2d at 457–458; Sas v. Maryland, 334 F.2d 506, 517 (4 Cir. 1964).

41. See note 1, *supra*.

On their face, these contentions appear neither remote nor insubstantial. But at least some of them may turn on questions of fact which cannot be resolved in an appellate court. Moreover, orderly judicial procedure normally precludes raising on appeal issues not reasonably within the scope of the question presented by a petition for habeas corpus. There is no reason to consider an exception to this rule in the instant case.

The usual procedure would be simply to dismiss this aspect of the appeal, leaving appellant free to bring a new habeas corpus petition if he wishes. However, petitioner is an indigent with an I. Q. of 52. To place upon him the burden of preparing a new petition and obtaining appointment of a new attorney by the District Court seems an unwarranted hardship which would serve no ascertainable interest of judicial administration.[42] At oral argument in this court, it clearly appeared that the attorneys appointed for him on this appeal would be willing to continue to represent him on any remand. Accordingly, since there is to be a remand in any event, I would direct the District Court to consider these issues on an amended petition, as well as the transfer question.[43] But see Judge Fahy's position as to this in his opinion concurring specially.

Remanded.

FAHY, Senior Circuit Judge (concurring specially):

I agree with Judge Bazelon that the case should be remanded for a fuller hearing, but I wish to state as now set forth my approach to the problem, albeit on the background of the more detailed discussion in the opinion of Judge Bazelon.

Deprivation of liberty by the government is authorized when consonant with due process of law and applicable statutory provisions; and when ordered the deprivation is subject to examination as to its validity by proceedings other than those by which the deprivation initially occurred. Usually this is by appeal from the judgment or order requiring the deprivation; but judicial inquiry in many instances is available also by habeas corpus proceedings. This is so where there has been a previous civil commitment to St. Elizabeths, as here. The validity of continued confinement of the committed person in the maximum security ward there, rather than in a less restrictive facility, may be questioned and decided. Miller v. Overholser, 92 U.S.App.D.C. 110, 115, 206 F.2d 415, 419; and see Lake v. Cameron, 124 U.S.App.D.C. 264, 364 F.2d 657 (en banc). When, however, the deprivation of liberty is based on the person's dangerousness to himself or others due to his mental condition, the degree of deprivation is not for the judiciary to pass upon except under a restraint consistent with the deep involvement of the medical discipline, that is, the discipline of those charged under the law with the administration of the institution. While the individual may bring the matter to court as a case or controversy under the Constitution, the court, in passing upon the validity of the deprivation of liberty, a judicial function, recognizes the responsibility the law places also upon those in charge of the institution. Thus, in Tribby v. Cameron, 126 U.S.App.D.C. 327, 379 F.2d 104, as pointed out by Judge Bazelon, the question was stated to be whether the administrator,

has made a permissible and reasonable decision in view of the relevant information and within a broad range of discretion.

It was appropriate, therefore, on the pleadings in this case, appellant having been confined in the maximum security

---

42. *Cf.* Caplan v. Cameron, 125 U.S.App. D.C. 150, 369 F.2d 195 (1966); Dobson v. Cameron and Stultz v. Cameron, 127 U.S.App.D.C. 324, 383 F.2d 519 (1967).

43. If appellant decides to pursue these matters below, I think the District Court may permit him to amend his petition. If it declines to do so, he will of course be free to raise them by a new petition.

ward for ten years, for the District Court to inquire whether appellant was being excessively deprived of liberty. The government does not contest this, as I understand, taking the position that the record supports appellant's continued detention in John Howard Pavilion or, if not, that a fuller hearing would so disclose. Our question, then, is whether the hearing in the District Court did explore the problem fully enough to enable the court to decide, not whether appellant's detention at St. Elizabeths is valid, which was not questioned in the District Court, but whether it should continue as at present in the John Howard Pavilion. As to this I agree to a remand for a fuller hearing, particularly with respect to possible alternative facilities with less restrictive deprivation of liberty. The hearing on the remand I think should bring the following into the record:

1. The reports regarding appellant required by law to be kept by the hospital;

2. The history of appellant and of his illness, including his present condition, the treatment he is receiving at the hospital, and the efficacy of the treatment;

3. A comparison of the John Howard Pavilion and the treatment there available with possible alternative facilities at St. Elizabeths and the treatment there available,[1] with an exploration of the differences in supervision and restrictions and the comparative therapeutic results likely to ensue;

4. The conclusion or conclusions of the hospital authorities as to the nature of the confinement appellant should have, with the reasons therefor, reached in recognition that no greater deprivation of liberty should be had than is reasonably required for his safety and the safety of others, in determining which consideration should be given to the desirability of seeking improvement in appellant's condition.

The foregoing should not be considered as limiting the scope of the hearing if the parties or the court advance other data which the court in the exercise of a sound discretion deems admissible.[2]

As to the burden of proof, my view is that when the appropriateness of a particular deprivation of liberty has been drawn in question by supporting evidence, its continued validity depends upon a showing, in the circumstances of appellant's confinement,[3] that within a broad range of discretion of the hospital authorities, exercised upon the basis of the relevant information, the deprivation is supported by substantial evidence and is reasonable.

As to the validity of appellant's original commitment, questioned for the first time on the appeal in this court, it is possible that on further consideration neither appellant nor counsel would desire to pursue this. I think our court should refrain from seeming to encourage its pursuit. It is a matter which I think should be left for the parties and the District Court in the light of such circumstances as might develop.

---

1. Though appellant makes no issue as to his treatment, intertwined with the evaluation of his present confinement is the consideration of appellant's general right to treatment. See Rouse v. Cameron, 125 U.S.App.D.C. 366, 373 F.2d 451; Ragsdale v. Overholser, 108 U.S.App.D.C. 308, 315, 281 F.2d 943, 950 (concurring opinion).

2. I hope the hospital itself will find itself able to establish internal procedures such as suggested in Rouse v. Cameron, *supra* note 1, repeated in Judge Bazelon's present opinion.

3. Compare Ragsdale v. Overholser, *supra* note 1 (concurring opinion).

# APPENDIX

Excerpts from

## "THE EVALUATION OF SECURITY PROGRAMS AND FACILITIES AT SAINT ELIZABETHS HOSPITAL"

Report

by

## AD HOC COMMITTEE FOR THE EVALUATION OF SECURITY PROGRAMS AND FACILITIES AT SAINT ELIZABETHS HOSPITAL

Committee Members:

Hege, John H., Sr., M.D., Chairman
Kenefick, Donald P., M.D.
McGarry, A. Louis, M.D.
Settle, Russell O., Sr., M.D.

Smith, Harvey L., PH.D.
Watson, Andrew S., M.D.
Weihofen, Henry, J.S.D.
Zubowicz, George, M.D.

Louis Jacobs, M.D.
Executive Secretary

National Institute of Mental Health
Chevy Chase, Maryland

November 1, 1968

(Emphasis in original.)

## RECOMMENDATIONS AND FINDINGS

### A. Recommendations

1. *The practical aspects of the treatment of the so-called security patients in separate facilities and the need for it.* * * * Few professionals count these people in their problems or among their concerns. Efforts should be made to bring all patients requiring security services under an administrative officer who shall have four assistants responsible for recruitment and training, research, treatment services and legal matters.

2. *Modification of John Howard Pavilion.* The Committee study would indicate that approximately one-half of the patients confined in the JHP could be adequately cared for in the less secure units within the Security section or in other parts of Saint Elizabeths Hospital.

*   *   *   *   *   *

5. *Decentralization of Security Decisions.* The Committee views the decision-making of the Security section, particularly as it relates to security issues, to be too centralized. Security (degree of restrictions) is an integral part of the treatment process. Therefore, it is recommended that these decisions be made as closely as possible to the area (wards) where the treatment process takes place, by the personnel responsible for the care of the patient.

6. *Reduction of Inpatient Pretrial Examinations.* Much staff time and bed space seems to be utilized unnecessarily in the performance of psychiatric examinations for the courts. To greatly reduce the number of patients admitted to the Security section for psychiatric examination the Committee recommends that:

a. A service be developed to conduct screening examinations on an out-

patient basis by the comprehensive community mental health centers.

b. Admission to the Security service of Saint Elizabeths Hospital of only those patients requiring more comprehensive psychiatric evaluations or who are actually psychotic.

c. Place those admitted to the Hospital in the appropriate custody level of housing.

d. Develop a jail-located psychiatric service to screen misdemeanants (optional for civil commitment whenever possible).

7. *Improved Aftercare Service.* * * * The Committee recommends that an effective aftercare service be developed through clinics and mental health services, and social workers on the staff of the Hospital itself.

\* \* \* \* \* \*

10. *Use of All Hospital Services.* Integration of clinical services should be accomplished to the end that all treatment modalities within Saint Elizabeths Hospital will be available for the patients requiring security services.

11. *Program Goal.* The Committee recommends that the long range goal should be the transition of patients committed upon acquittal of criminal charges by reason of insanity to the same status and treatment as other patients in the general hospital wards. So far as possible the same should be true of persons committed because they are mentally incompetent to stand trial.

B. Findings of the Committee

The National Institute of Mental Health is responsible for the implementation of the treatment program at Saint Elizabeths Hospital. This is a 7,000 bed federal mental hospital of which 700 beds are currently designated as a Security section. The study of this Committee concerns evaluation and programming as these relate to this section of the Hospital.

\* \* \* \* \*

1. *Security Facilities.* The section designated for Security currently consists of three divisions: the John Howard Division, in a maximum security building with 395 beds; the West Side Division (in the Center Building), with 422 beds; and the Cruvant Division with 123 beds.

a. *John Howard Division* is occupied by criminal proceedings patients which include those committed for pretrial examinations, not guilty by reason of insanity, prisoners from the D. C. Department of Corrections and the Federal Bureau of Prisons, those found to be incompetent to stand trial and those committed under the sexual psychopath laws. As a general practice those *male* criminal proceedings patients involved in felonies are treated in the John Howard Division. There are a number of potentially dangerous civil patients treated here also.

b. Of the 422 patients of the *West Side Division* approximately 150 are civil commitments transferred from other sections of Saint Elizabeths Hospital to this area because of peculiar management problems and the need for more security. The remaining 275 patients in this building are misdemeanant criminal proceedings patients committed for pretrial examination, not guilty by reason of insanity, incompetent to stand trial and sexual "psychopaths." * * *

c. *The Cruvant Division* is composed of four wards, three of which are occupied almost exclusively by *female* criminal proceedings patients. * * * and there are some sexual psychopaths as well as potentially dangerous civil patients. One ward is occupied by a small group of male patients who have been transferred from John Howard Division into the terminal phases of treatment involving minimal security prior to release into the community.

2. *Major Issues for Staff.* * * * The values of the court-prison system and those of the Hospital conflict in an uneasy balance. There is a confused definition of the patients as either "prisoners" or "patients." The contingencies of each value system trammel up the tasks of the others. The Hospital staff does not seem to have optimal communication with the courts it serves or a suf-

ficiently knowledgeable and critical understanding of the legal principles it helps to administer. \* \* \*

A second major concern of the staff is the lack of space and facilities to implement treatment involving the concept of the therapeutic milieu or therapeutic community at a satisfactory level. The Committee saw evidence which validated this opinion; for example, the space in John Howard. Division is largely occupied by patients, leaving inadequate space for adjunctive therapy.

A third major concern of the staff is an insufficient number of hospital personnel in all categories. For example, as related to professional personnel, the Security section finds it most difficult to have psychiatric residents from the training program of Saint Elizabeths Hospital rotated through the Security sections.

\* \* \* \* \* \*

3. *Semiautonomy of Security Section.* The security facilities seem to be islands of autonomy, hardly linked to each other and markedly shielded from the rest of the Hospital. They hardly share each other's resources and seem deprived from sharing those from the Hospital at large. \* \* \* A semiautonomous status of security services would facilitate implementation of those matters largely peculiar to the section, e. g., relationships to law enforcement agencies and the courts. Integration of clinical services should be accomplished to the end that all treatment modalities within Saint Elizabeths Hospital will likewise be available for the security patients.

\* \* \* \* \* \*

The Committee believes that the criminal behavior of the mentally ill is simply another form (out of many forms) of deviant behavior characteristic of severe mental illness.

As certain forms of mental illness can best be treated in the hospital setting the Committee recommends that the long range direction of the Saint Elizabeths Hospital program should be towards development of a modern psychiatric hospital program in which all patients can freely participate regardless of the type of deviant behavior they have manifested.

In other words, the separation of so-called "criminally insane," in a special unit separate and apart from the rest of the patient population at Saint Elizabeths Hospital, should be considered as a temporary and transitional measure which eventually will lead towards complete integration of both groups of patients within a uniform and therapeutic hospital program.

4. *Staff Organization.* A more integrated continuum of care and record keeping is necessary for the security units. *It is recommended that all Security services be placed under a chief administrative officer charged with the responsibility of coordinating administrative and clinical functions within the section. He should have at least four professional assistants,* one devoted to recruitment and training, one to research, one an attorney devoted to relationships with the courts and consultation for the professional staff of the three units, and one concerned with treatment services.

\* \* \* \* \* \*

5. *Legal Rights of Patients. A special assistant to the chief administrative officer should be a legal officer who would have the function of protecting the legal rights of patients, informing them what their legal rights are, and checking as to whether these rights are being observed; and to act as their spokesman in making complaints. To carry out these functions without constraint, this legal officer should not be a part of the Hospital staff but should be autonomous.* These services could be obtained by contract with private law firms or with the law departments of the academic community.

6. *Treatment.* The present treatment program in the Security sections is better than the treatment provided in many such institutions. This is due to the dedication of a limited number of profes-

sional staff laboring under many disadvantageous circumstances. The John Howard Pavilion needs to make its environment more "livable" and less prison-like. There is too much "sitting around" on the wards at the present time. Adjunctive therapy should be greatly expanded including academic education, vocational training and rehabilitation, religious instruction, recreation, arts, music, etc. All adjunctive treatment must be related to therapeutic goals and not be merely time fillers. While it is amply clear that individuals in the maximum Security unit now suffer from massive social deprivations of all sorts, merely supplying them with socializing experience is no substitute for interpreted experience which will modify personality operations. Extensive development of these resources should only be carried out in the context of their explicit utilization for treatment.

\* \* \* \* \* \*

Too often, the law and the legal professional seem to focus their concern on the number of escapes, the quality and quantity of controls, sufficient length of confinement, etc., to the exclusion of therapeutic considerations.

Recent opinions from the Court of Appeals have explicitly stated that a person committed for treatment must receive treatment or be discharged. Medically adequate treatment is that which at least does not worsen the condition and which either limits the extension of the disease process, or, ideally, eliminates the pathological situation. It is carried out with skill and competency commensurate with the standards of the community, and in concurrence with the implied or explicit contractual agreement between the parties.

\* \* \* \* \* \*

\* \* \* The balance between dangerousness and treatability is now demanded by the law of the District of Columbia. It is a dynamic type of question and it may not be met by any absolute and categorical criteria. To make the balanced judgments regarding these two questions which have both medical and legal im-

plications, is a task for persons highly trained in both the medical and legal issues involved.

\* \* \* \* \* \*

The Committee is not cognizant of the data which would establish the minimal number of clinical and other personnel which would qualify as adequate at the security facilities at Saint Elizabeths Hospital. We would stress that quality is a more important consideration than quantity with respect to the adequacy of treatment. We would observe, however, that in comparison to similar institutions the number of personnel attached to the Security division, particularly in the social work and attendant categories, ranks low.

Medically adequate treatment itself is probably going to have to be reassessed in the mental hospital. *Programming should proceed on the assumption that the institution will be a hospital and will treat mentally ill persons.* It is true that criminally committed patients are more likely to be dangerous than most of those civilly committed; and special precautions and procedures will continue to be required for patients who are dangerous to others or to themselves. Suffice it to say that in addition to the modalities used in the care of the mentally ill in general psychiatric hospitals, there are available special methods and techniques which have proved effective in security settings. There should be combined the best features of a quality "corrections" approach and mental hospital program.

7. *Individual Treatment Plan.* While we have not presumed to establish generalized clinical positions which might or might not be appropriate for a particular patient, we would affirm that:

a. There should be a recorded assessment of the pathology and assets of the individual.

b. There should be a recorded treatment plan.

c. The treatment plan should be implemented in good faith within the limits of available resources.

d. There should be a periodic recorded assessment of treatment progress or the lack of it.

e. Significant modifications to the treatment plan and their rationale should be recorded.

f. Where available resources fall below the standards acceptable to the individual clinician, he should communicate the realistic needs of the situation to proper authorities.

8. *Degrees of Security.* As has been observed in other mental hospitals, in the practice concerning the housing of patients committed by the criminal courts, it seems to be assumed that a court order committing a person for criminal purposes (pretrial examination, hospitalization of those found incompetent to stand trial, and of those found not guilty by reason of insanity) necessarily means that such patients be kept under maximum security. The court order does not in fact say this. It merely orders the person " * * * committed to * * * the mental hospital designated by the court * * * " nor is there any reason to read a special security requirement into the order. Patients so committed are as fully subject to the Hospital's administrative discretion as to where to house them as are civilly committed persons. As with the civilly committed, the Hospital has the duty of determining whether the individual person is in fact dangerous and in need of greater restraint than others, but there is no reason for the assumption that, merely because the patient comes to the Hospital by way of commitment from the criminal courts, as distinguished from the civil, he must ipso facto be placed in maximum security, without the diagnosis or prognosis of actual dangerousness. At the present time it is primarily the Registrar who makes the decision that a person should go to maximum security. The determination is in fact a mechanical one: new admissions from the U.S. District Court are assigned to the John Howard Division; misdemeanants from the Court of General Sessions are committed to the West Side Division. The clinical directors, however, of these two divisions may, and do, exchange patients, if after a period of observation these are determined to be in need of either greater or lesser security.

It appears that security is both overused and underused at the Hospital. It is estimated that one half of the men at JHP do not require maximum security. On the other hand, the escapes from Cruvant Division and the West Side Division are astonishingly high (President's Commission on Crime in the District of Columbia). It seems clear that there is excessive security at one end of the spectrum and little or no security elsewhere—an all or none situation. It would seem clear that medium security facilities are called for—an intermediate and graduated step system.
* * *

Reevaluation of the current "patient load" in the Howard unit would permit a sizable number of these people to be treated in a less secure or even in an open setting. The security of those remaining should be transferred from the inside to the *periphery*. With few exceptions, whatever controls are needed on the inside should be incorporated in therapeutic measures inherent in the total treatment program.

Any rational approach to the problem must pay cognizance to the history of this institution and its current physical plant. The JHP, built to provide security which could not be surpassed even by most prisons, automatically forces upon the staff a form of treatment that is less than desirable. However, it represents such a large number of beds it will probably have to be used in the immediate future. Extensive modification of the physical structure will be required to make it optimally effective within its current character.
* * * * * *

10. *Decisions Decentralized.* At the present time the decision-making, particularly as it relates to security issues (transfers, releases, ground privileges, etc.), is too centralized. In a mental

hospital, security (degree of restrictions) is an integral part of the treatment process. Therefore, decisions about restrictions should be made by the personnel who regulate the area (wards) where treatment processes (milieu therapy) take place. Milieu therapy should provide the opportunity of training the emotionally disturbed through planned management of the structure and processes of the situation in which they live.

11. *Care for Conditionally Released.* A certain number of the criminally committed patients is conditionally released. There is no very effective follow-up or aftercare, either of the conditionally released or of those finally discharged. * * * The effective way is to bring the aftercare service into the neighborhood through the clinics and mental health services, or through social workers on the staff of the Hospital itself who can go to the patient's home and into the neighborhood. This means an extensive development and enlargement of social services.

\* \* \* \* \* \*

15. *Hospital-Court Relationships.* \* \* As legal personnel begin to learn about mental health concepts, they can build more effective legal procedures to cope with obedience, prevent the preventable, and at least carry out their activities with people in more effective ways. Similarly, the "legal education" of Hospital personnel should be developed so that they know exactly what social values are built into legal concepts with which they deal. Such relevant roles as "expert witness" should be clearly understandable by mental health persons. Psychiatrists and other behavioral staff should be able to go into court understanding completely what their function is to be so that they may carry it out without inappropriate anxieties and with a sense of appropriate participation.

\* \* \* \* \* \*

18. *Community Tolerance.* Every mental hospital, but particularly one with a security unit, must be aware of and sensitive to the community level of tolerance for its programs and patients. As the community's tolerance greatly influences formulation of treatment programs, the Hospital, through a public education program, must endeavor to improve the degree of its acceptance by the community. Development of as many as possible hospital-community contacts will help not only the intramural programs but also open doors to a much more extensive and effective posthospitalization program for discharged patients.

