**In the Matter of Donald PLUMMER, Appellant.**

Nos. 86–FM–1697, 87–FM–1239, 87–FM–1423, 88–FM–642 and 88–FM–1565.

District of Columbia Court of Appeals.

Argued Jan. 10, 1991.
Decided May 15, 1992.

Davis, Washington, D.C., were on the brief, for appellant.

Sheila Kaplan, Asst. Corp. Counsel, with whom Beverly J. Burke, Acting Corp. Counsel at the time the case was argued, Charles L. Reischel, Deputy Corp. Counsel, and Ann O'Regan Keary, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellee.

Before ROGERS, Chief Judge, and SCHWELB and WAGNER, Associate Judges.

ROGERS, Chief Judge:

In these consolidated appeals, appellant Donald Plummer, a civilly committed adult, raises several challenges to the validity of his commitment as an involuntary inpatient at Saint Elizabeths Hospital ("the Hospital"). He contends that (1) the court order revoking his earlier outpatient commitment was invalid because the Hospital failed to file a timely revocation petition after appellant was returned to the institution; (2) the revocation order was invalid because the Hospital failed to demonstrate at the revocation hearing that indefinite inpatient commitment was the least restrictive treatment alternative; and (3) once the Hospital released him to the community on indefinite convalescent leave, he became a *de facto* outpatient, requiring the Hospital to honor his due process rights when returning him to the institution. We agree with appellant's third contention, and accordingly reverse.[1]

## I

Appellant was originally civilly committed in 1983, and ordered to participate in an outpatient course of treatment under the supervision of the Hospital. D.C.Code § 21–545(b) (1989). The outpatient commitment order allowed the Hospital to return appellant to the Hospital for inpatient treatment if he failed to participate in outpatient treatment, or if his condition deteriorated, for up to five days, with oral notice to his counsel within twenty-four hours of his return to the Hospital. At the

David L. Norman, Public Defender Service, with whom James Klein and Laurie B.

---

1. We therefore do not address appellant's first two contentions.

end of five days, the Hospital was required to restore appellant to outpatient status unless, within that period, the Hospital had petitioned the court for revocation of the outpatient order.

Between 1983 and 1986 appellant participated in outpatient treatment. Although on several occasions he failed to comply with the prescribed course of treatment, and was returned to the Hospital for brief periods of inpatient treatment, appellant resided in the community for the vast majority of that three-year period and received outpatient care. On October 28, 1986, after failing for approximately one month to take his medication, appellant was returned to the Hospital in a deteriorated mental state. The Hospital filed a timely notice of rehospitalization with the court, and the trial judge issued an *ex parte* order finding probable cause for appellant's return to the Hospital.

On November 6, 1986, the Hospital filed a petition to revoke appellant's outpatient commitment status. After a hearing at which a psychiatrist from the Hospital and appellant's sister testified, the trial judge concluded that appellant required inpatient hospitalization, at least for "eight weeks or a little bit more." The judge revoked appellant's outpatient commitment, and ordered appellant committed as an inpatient "for an indefinite period." Appellant's challenge to this order is the basis for appeal No. 86–FM–1697.

After the revocation order, appellant spent just over a month in the Hospital, and was then released on "temporary leave."[2] On February 18, 1987, the Hospital placed appellant on "convalescent leave," which meant that he was allowed to remain in the community for an indefinite period, receiving occasional "outpatient services" from the Hospital. On May 28, 1987, appellant filed a motion with the trial court, asking that his commitment order be modified to reflect the fact that he was now effectively an outpatient. *See* Super.Ct.Civ.R. 60(b) (1990). By the time the trial judge heard oral argument on September 16, 1987, appellant had resided in the community for eight months, receiving outpatient psychiatric services from the Hospital. The trial judge denied the motion, relying in large part on an affidavit from one of appellant's treating physicians. The affidavit indicated that although appellant had continued to keep his outpatient appointments, "[t]here has been no increase in his insight to mental illness and no change in his mental attitude." Thus, appellant retained the legal status of an inpatient, subject to return to the Hospital without any due process rights. This order is the basis for appeal No. 87–FM–1239.[3]

## II

■ After appellant's outpatient status was revoked, the Hospital kept him in the institution for a period of weeks, and then released him on indefinite convalescent leave on February 18, 1987. Appellant contends that once he was released to live in the community for an indefinite period of time, he became a *de facto* outpatient, entitled to the same due process rights as a patient who is originally committed as an outpatient. *See In re Richardson*, 481 A.2d 473 (D.C.1984). We agree.

■ The court in *Richardson, supra,* stated that the question posed by the case was "the appropriate procedures to be followed when reexamining a mentally ill individual, on an inpatient basis, who has previ-

---

**2.** The Hospital regulations at that time defined a patient on "temporary leave" as one who is allowed to live in the community for a period not to exceed thirty consecutive days.

**3.** The record reflects that appellant was in fact returned to the Hospital on several occasions after the September hearing, pursuant to D.C.Code § 21–592 (allowing the Hospital to request a court order to return an inpatient who "has left [the] institution without authorization or has failed to return as directed"). On one

such occasion the trial judge granted a hearing on the Hospital's § 21–592 order, at which appellant again urged the court to grant him the legal rights of an outpatient. The judge denied appellant's motion, which forms the basis for appeal No. 87–FM–1423.

Appellant also challenges the Hospital's practice of obtaining *ex parte* court orders to return inpatients to the institution, in appeals No. 88–FM–642 and No. 88–FM–1565. We do not reach this issue. *See* note 7, *infra.*

ously been permitted to live in the community." *Id.* at 476. The court concluded that (1) "the Superintendent of the Hospital must provide the court with an affidavit within twenty-four hours of a patient's return to the institution," (2) the court must "make a prompt, *ex parte* determination that the patient has failed to abide his treatment regimen or has suffered a deterioration in his condition," (3) "patient's counsel must also be provided with a copy of the affidavit within twenty-four hours of the patient's return," and (4) "both the patient and his counsel shall be informed in writing that the Hospital must either release him after the fifth day of institutional care and observation, or thereafter move for a prompt adversary judicial hearing seeking the permanent revocation of his outpatient status." *Id.* at 480–81. A committed outpatient must receive these so-called *"Richardson* rights" when the Hospital returns him or her to the institution.

■ Although *Richardson* arose in the context of a patient whose original commitment order authorized "outpatient" treatment, we agree with appellant that similar considerations apply here. Every person committed, whether as an inpatient or an outpatient, has the right to treatment by the least restrictive means. *Id.* at 479. Once the Hospital releases an inpatient to live in the community for an indefinite period of time, that patient obtains an "interest in not being erroneously deprived of his freedom to remain in the community." *Id.* at 482.

■ Several courts from other jurisdictions have also recognized the important liberty interest possessed by committed inpatients who are released on indefinite leave. *See In re Application of True,* 103 Idaho 151, 645 P.2d 891 (1982); *see also Birl v. Wallis,* 619 F.Supp. 481 (M.D.Ala. 1985); *Lewis v. Donahue,* 437 F.Supp. 112 (W.D.Okla.1977) (three-judge court); *Meisel v. Kremens,* 405 F.Supp. 1253 (E.D.Pa. 1975) (Higginbotham, J.); *In re Commitment of B.H.,* 212 N.J.Super. 145, 514 A.2d 85 (1986). As the court in *Application of True, supra,* stated:

The granting of out-patient standing did change [the patient's] situation—she ceased to be a person who was institutionalized and became a person permitted to enjoy a substantial degree of liberty. Conversely, revocation of leave effected an involuntary transfer from a relatively non-restrictive environment to a restrictive one, and a correlative deprivation of a measure of freedom.

103 Idaho at 156; 645 P.2d at 896 (quoting *Lewis v. Donahue, supra,* 437 F.Supp. at 114). These courts have analogized conditional release from a mental hospital to parole. Because the Supreme Court has held that a parolee is entitled to notice and a hearing before the state can revoke his conditional liberty, *Morissey v. Brewer,* 408 U.S. 471, 482, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), courts have concluded that a patient on indefinite leave from an institution is similarly entitled to certain due process rights when returned to the institution for inpatient care:

The liberty at stake in a civil commitment proceeding is as valuable an interest as the liberty at stake in a criminal trial. And the Supreme Court has unanimously held that the "conditional liberty" of the paroled criminal falls within the scope of the Fourteenth Amendment and is entitled to the protection of the Due Process Clause.... I cannot see how the "conditional liberty" of the paroled mental patient differs in any significant respect from the "conditional liberty" of the paroled criminal....

*Meisel v. Kremens, supra,* 405 F.Supp. at 1256 (citations omitted); *see also Birl v. Wallis, supra,* 619 F.Supp. at 490 ("due process requires that mental patients ... be given certain basic procedural safeguards before they are returned from trial visit"); *Lewis v. Donahue, supra,* 437 F.Supp. at 114 (holding unconstitutional a statute "which permits the revocation of out-patient or convalescent leave without notice or opportunity to be heard prior to re-institutionalization"); *Application of True, supra,* 103 Idaho at 163, 645 P.2d at 903 (the "minimum due process requirements" for return of an inpatient on conditional leave are prompt written notice of

the reasons for re-institutionalization, and a hearing before a neutral body as soon as reasonably possible); Annotation, *Right to Notice and Hearing Prior to Revocation of Conditional Release Status of Mental Patient*, 29 A.L.R. 4th 394 (1984); Note, *Constitutional Law: The Summary Revocation of an Involuntary Mental Patient's Convalescent Leave—Is it Unconstitutional?*, 33 OKLA.L.REV. 366 (1980). *But see Hooks v. Jaquith*, 318 So.2d 860 (Miss.1975).[4]

The District of Columbia Hospitalization of the Mentally Ill Act, D.C.Code §§ 21–501 to 21–592 (1989) ("the Act"), is designed to protect the liberty interests of the patient. *See In re Feenster*, 561 A.2d 997, 999 (D.C. 1989). With the advances in the medical treatment of the mentally ill, the old distinctions between inpatients on convalescent leave and outpatients may lose much of their clarity. As the Hospital has modified its methods of treatment, the courts have tried to be supportive of those efforts. But while old definitions of "inpatient" and "outpatient" may give way to new arrange-

ments, what remains clear is the protection that is afforded to the patient under the statute. When a patient who is living outside the Hospital suffers a relapse after ceasing to take his or her medication, and the Hospital determines that the patient can function indefinitely on convalescent leave outside the Hospital, the patient acquires procedural rights that must be respected before the patient can be involuntarily returned to the Hospital for an indefinite period of time. Appellant, as a committed inpatient on indefinite convalescent leave, was entitled to protection similar to those described in *Richardson, supra*, 481 A.2d at 480–81.[5]

Accordingly, because appellant became a *de facto* outpatient once the Hospital placed him on indefinite convalescent leave, appellant must be granted the legal status of an outpatient, *see Feenster, supra*, 561 A.2d at 1000;[6] the judgments in appeal Nos. 87–FM–1239, and 87–FM–1423 are reversed, and the case is remanded to the trial court with instructions to order that

---

4. The Hospital attempts to distinguish these cases as involving either "specific statutory schemes for 'conditional release' of patients to the community" or "procedures specifically contained in state mental health policies." Regardless of the source of the Hospital's authority to release committed inpatients, however, a patient on convalescent leave has a protected interest in remaining in the community. Indeed, many of the courts declared unconstitutional the "specific statutory schemes" allowing summary return to the institution. *See, e.g., Lewis v. Donahue, supra*, 437 F.Supp. at 114. The fact that in the instant case the Hospital could not rely on an express authorization to release appellant (and subsequently to return him summarily) cannot insulate the Hospital's practice from judicial scrutiny in view of the statutory and constitutional rights which are implicated.

5. The Hospital contends that "appellant never specifies what cut-off time the court should require before" an inpatient released to the community acquires a conditional liberty interest which cannot be impaired without *Richardson*-type procedures. We need not establish any specific time-table. For purposes of this appeal it suffices to establish that once the Hospital decided to place appellant in the community on convalescent leave for an indefinite period of time, appellant obtained rights similar to those described in *Richardson*. We leave to another day the question whether an inpatient released

on "temporary" leave for a sufficiently long fixed period of time could similarly become a *de facto* outpatient.

6. As in *Feenster, supra:*

[The patient's] proper status is that of a civilly committed outpatient undergoing voluntary treatment at the hospital. If [he] were to decide to leave the hospital and the hospital were to conclude that [his] status as an outpatient would threaten his health or well-being or the safety of the community, the hospital, of course, is not without recourse to detain him. Should [he] apply for release, the hospital may hold him for forty-eight hours, if necessary, to decide whether it wishes to initiate outpatient revocation procedures. D.C.Code § 21–512 (1981). If the hospital decides to detain [him], it must notify him and his counsel (if he is represented) of its decision immediately. Then, following *Richardson, [supra,]* 481 A.2d at 480–81, within twenty-four hours of the detention decision—i.e., no more than three days after [his] application for release—the hospital must file the required notice of hospitalization with the court and comply with all of the other procedural requirements set forth in *Richardson*
 . . . .

*Id.* at 1000. Here, on remand, the judge will have to take into consideration any relevant occurrences during the intervening period while Plummer has been on convalescent leave.

appellant's outpatient commitment be restored in accordance with this opinion.[7]

*Reversed and remanded with instructions.*

ROGERS, Chief Judge, concurring:

I write separately because our prior decisions make clear that appellant's other contentions are equally persuasive. The court order revoking appellant's outpatient status was invalid because (1) the Hospital failed to file a timely revocation petition, and (2) the Hospital failed to demonstrate at the hearing that indefinite inpatient treatment was the least restrictive alternative. The liberty interests at stake are too precious to allow the Hospital to avoid the statutory and constitutional protections of a citizen otherwise entitled to be left alone by the government.

### I

The District of Columbia Hospitalization of the Mentally Ill Act reflects a "profound congressional concern for the liberties of the mentally ill." *In re DeLoatch,* 532 A.2d 1343, 1345 (D.C.1987) (quoting *Covington v. Harris,* 136 U.S.App.D.C. 35, 41, 419 F.2d 617, 623 (1969)). The court has thus construed the Act with the understanding that it "was designed with a view to securing at last the civil and constitutional rights of [a] long-neglected group." *In re Lomax,* 386 A.2d 1185, 1188 (D.C. 1978) (citing various opinions of the U.S. Court of Appeals for the District of Columbia Circuit and the legislative history of the Act). The Act assures that a person suffering from a mental illness will receive the least restrictive treatment. *Covington v. Harris, supra,* 136 U.S.App.D.C. at 41, 419 F.2d at 623. It further makes clear a preference for voluntary commitment for treatment. *See In re Blair,* 510 A.2d 1048, 1050

(D.C.1986) ("Congress ... recognized that voluntary hospitalization was preferable to emergency, involuntary detention"); *see also Lake v. Cameron,* 124 U.S.App.D.C. 264, 268, 364 F.2d 657, 661 (1966) (en banc) ("Every effort should be made to find a course of treatment which [the patient] might be willing to accept"). "We therefore construe the Act narrowly where its application results in the curtailment of an individual's liberty." *In re Reed,* 571 A.2d 801, 802 (D.C.1990) (citing *Lomax, supra,* 386 A.2d at 1187–88).

The Act "provides 'an explicit and expedited timetable' for involuntary hospitalization procedures." *Reed, supra,* 571 A.2d at 802 (quoting *Lomax, supra,* 386 A.2d at 1188). In *In re Richardson,* 481 A.2d 473 (D.C.1984), the court held that when the Hospital returns an outpatient to institutional care, it "must either release him *after the fifth day* of institutional care and observation, or thereafter move for a prompt adversary judicial hearing seeking the permanent revocation of his outpatient status." *Id.* at 481 (emphasis added). Appellant's original 1983 outpatient commitment order contained similar language:

> [T]he hospital may return respondent to inpatient status at the hospital *for a temporary period not to exceed five days* .... At the expiration of five days, the hospital shall again release [appellant] to outpatient status unless within that period the hospital has recommended to the Court in writing that the order of outpatient commitment be revoked, with [appellant] having the right to a prompt hearing before the Court to contest the recommended change in status. [Emphasis added].

Appellant was returned to the Hospital on October 28, 1986. The Hospital was therefore obliged by November 4, 1986,[1]

---

7. Because appellant's outpatient status is restored, we dismiss as moot appeal No. 86–FM–1697 (challenging the revocation of appellant's outpatient status), and appeal Nos. 88–FM–642 and 88–FM–1565 (challenging the Hospital's authority to obtain *ex parte* orders to return inpatients to the institution). Notice to the court of September 25, 1991, from counsel for the Hospital that appellant remains committed under D.C.Code § 21–545 while being supervised at a

community health center on outpatient status, does not moot the other appeals. *In re James,* 507 A.2d 155, 159 n. 5 (D.C.1986).

1. For purposes of this appeal, I accept appellant's concession that the relevant deadline was November 4, 1986, seven days after the rehospitalization, since the intervening Saturday and Sunday were to be "excluded in the computa-

either to release appellant or to file a petition for a revocation hearing. The Hospital took neither action, however, and did not file a petition until November 6, 1986. The Hospital thus properly conceded at oral argument that it failed to comply with the procedural time limit established by both *Richardson* and appellant's outpatient order. The Hospital's contention—that its failure to comply with the time limit should not invalidate the ultimate judicial determination that appellant's outpatient commitment be revoked—has been rejected by the court on several occasions.

Thus, in *DeLoatch, supra,* 532 A.2d 1343, a patient had demanded a hearing pursuant to D.C.Code § 21–525 (1981) to challenge the trial court's *ex parte* order authorizing his detention for up to seven days. The patient did not receive a hearing within twenty-four hours of his request, as required by the statute. The court rejected the Hospital's argument that "the trial court's ultimate determination that probable cause existed to continue detention cured any error of noncompliance with the statutory time limitation." *Id.* at 1345. Because the patient "was held without independent judicial review beyond the time limitations set forth by statute," subsequent judicial action could not cure the fundamental defect. *Id.* Similarly, in *In re Feenster,* 561 A.2d 997 (D.C.1989), a patient was held for ten days before the Hospital filed a notice of hospitalization which should have been filed within twenty-four hours of the patient's return. The court held that neither a subsequent probable cause order nor the eventual adversarial revocation hearing could "cure [the patient's] illegal detention for ten days...." *Id.* at 999. Finally, in *Reed, supra,* 571 A.2d 801, the Hospital failed to file a petition for judicial hospitalization within seven days, as required by D.C.Code § 21–523. Despite the fact that the Hospital missed the deadline by only one day, the court held that "subsequent judicial review cannot

cure a failure to meet a statutory deadline." *Id.* at 804. In so holding, the court has recognized that the Act provides important safeguards to persons who are institutionalized against their will, and that a fundamental error at an early stage of the commitment process can never be cured by subsequent judicial action. *See, e.g., DeLoatch, supra,* 532 A.2d at 1345.

The Hospital nevertheless attempts to distinguish these cases by stressing that the notice of rehospitalization was filed promptly, and "unlike the notice of Rehospitalization, the filing of the revocation petition, the only document which appellant alleges was late, does not trigger any immediate judicial review." The Hospital fails to acknowledge, however, that in *Reed,* the relevant procedural violation concerned a late filing of a petition for hospitalization, which also would not trigger immediate judicial review. Moreover, the Hospital's timely notice of rehospitalization itself stated that "[t]he Hospital must either release the above-named patient after the fifth day of hospitalization or move for a judicial hearing seeking revocation of his outpatient commitment." Indeed, even its November 6th petition to revoke referenced the five day period, representing that the Hospital had determined that appellant required hospitalization beyond "the authorized five day period."

The Hospital's attempt to analogize its error to those procedural violations which may be cured by subsequent judicial action, *see, e.g., In re Rosell,* 547 A.2d 180 (D.C. 1988) (involving an affidavit improperly submitted by someone who was not a "physician of the person"),[2] must fail. As *Feenster* made clear, "a procedural error which ... result[s] in a patient's detention beyond the statutory time limits" can never be cured. 561 A.2d at 999. Although the Hospital's failure to file a timely revocation petition in the instant case did not violate a statutory deadline, it resulted in appellant's detention beyond the time limit proscribed

tion" of the deadline. *See* Super.Ct.Ment.H.R. 12(a) (1990).

**2.** The court in *Rosell* noted that it was bound by prior cases holding similar errors to be harm-

less. 547 A.2d at 182. *But see id.,* 547 A.2d at 183–85 (Rogers, J., concurring) (expressing concern over the vitiation of the statutory requirements).

by (1) the original 1983 outpatient order, (2) the notice of rehospitalization filed by the Hospital, and (3) our decision in *Richardson, supra*. These time limits are of no less significance than the time limits proscribed by the Act. Accordingly, "the revocation of appellant's outpatient commitment order was rendered invalid by the illegal detention that preceded it." *Feenster, supra*, 561 A.2d at 999–1000.[3]

## II

Even if the Hospital had filed a timely revocation petition, the trial judge erred nonetheless in ordering appellant's indeterminate inpatient commitment. When the Hospital moves to revoke a patient's outpatient commitment, it has the burden of "establish[ing] that inpatient therapy is ... the least restrictive alternative compatible with the ends of rehabilitation." *Richardson, supra*, 481 A.2d at 479 n. 4; *see also In re James*, 507 A.2d 155, 158 (D.C.1986); *In re Stokes*, 546 A.2d 356, 363 (D.C.1988). Moreover, in a revocation proceeding "the trial court [must] inquire into 'such alternative courses of treatment'" which may be available to meet the needs of the patient and the public. *Id.* (quoting *Lake v. Cameron, supra*, 124 U.S.App.D.C. at 268, 364 F.2d at 661). Thus, "the trial court's decision to revoke an outpatient commitment ... must abide by the least restrictive treatment principle, and be supported by an explicit finding that the proposed treatment is the least restrictive alternative." *Id.* at 158.

Although the trial judge found that "involuntary inpatient hospitalization is now the least restrictive alternative," the record does not support the trial judge's ultimate conclusion that committing appellant as an inpatient "for an indefinite period" is consistent with the least restrictive treatment principle. The Hospital presented one expert at the revocation hearing, who testified that for a period of approximately three years appellant had functioned successfully as an outpatient, requiring occasional periods of inpatient treatment at the Hospital. The expert further explained that appellant, in his current condition, required only a temporary stay in the Hospital:

Q. Do you have an opinion as to whether [appellant] needs to remain at the Hospital at this time?

A. Yes. I think [appellant] needs some more time, at least a couple of months or so, in an—hopefully in an intensive ward where they can work on more insight [into his mental illness].

.    .    .    .    .

Q. ... [D]o you have an opinion as to whether [appellant] could function in any other setting other than [the Hospital] at this time?

A. Not at this time. He's not stable.... [He] is not stable at this point to go back into the community today.

The trial judge credited this expert testimony, adding that "I would guarantee you [*i.e.*, appellant] would be out of there in eight weeks or a little bit more, as the doctor said, perhaps, because of the setback the last couple of weeks, and you'd be through with it." The judge nonetheless revoked appellant's outpatient commitment and ordered that he be committed as an inpatient for an indefinite period of time, concluding that "at this time I have no choice ... based on the evidence in this case as I have heard it, but to revoke the outpatient commitment at this time and send you back to the Hospital."

---

**3.** The Hospital contends that by failing to object in the trial court to the Hospital's late filing, appellant has waived the issue. Although ordinarily this court "will not consider in a civil case arguments made for the first time on appeal," *Henderson v. District of Columbia*, 493 A.2d 982, 995 (D.C.1985), "jurisdictional issues may always be raised." *Clay v. Faison*, 583 A.2d 1388, 1390 n. 2 (D.C.1990); *In re Allegations of Misconduct Against Juveniles Detained at and Committed at Cedar Knoll Inst., Dep't of Human Resources*, 430 A.2d 1087, 1100 (Ferren, J., dissenting); 5A C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1393 at 773 (2d ed. 1990). Because the trial court was without power to consider the Hospital's late revocation petition, appellant's challenge is best characterized as jurisdictional, properly raised on appeal. Indeed, our decision in *Feenster, supra*, 561 A.2d 997, made no reference to whether the patient had contended in the trial court that the Hospital's notification was untimely.

The trial judge thus ordered indefinite inpatient commitment even though his view of the evidence showed that appellant needed only "eight weeks or a little bit more" of intensive inpatient treatment. As in *Stokes, supra,* 546 A.2d at 363 (opinion of Mack, J., announcing the judgment of the court), "[t]he Hospital failed to explain why temporary revocation was not a satisfactory alternative" in appellant's case. As the court noted in *In re Mills,* 467 A.2d 971, 974–75 (D.C.1983) (citations omitted) (emphasis in original):

> The statutory scheme in this jurisdiction does not limit the court in a commitment proceeding to a polarized choice between indefinite hospitalization and unconditional release.... It has been construed to impose a duty upon the courts to explore alternatives both *within* the mental hospital ... and *outside* the hospital, ... and to require that the courts select·the least restrictive alternative which would serve the purposes of the commitment.

The Hospital's position that "[g]iven [appellant's refusal] to remain in the hospital even for a short period of time and [his demand for] immediate release, the court was compelled to revoke his outpatient commitment and order inpatient care" for an indefinite time, is simply contrary to the law. The principle of least restrictive treatment incorporated in the Act requires the trial court to craft an order that is minimally intrusive of the patient's liberty. *James, supra,* 507 A.2d at 158; *Stokes, supra,* 546 A.2d at 361 (opinion of Mack, J., announcing the judgment of the court).

Because the evidence indicated that appellant needed only temporary inpatient treatment, the judge could only temporarily revoke appellant's outpatient commitment and order him committed as an inpatient for a limited period of two to three months. The Hospital's expert opinion was that no more time was required, based on experience with appellant over many years. The judge therefore erred in ordering appellant's commitment as an inpatient for an indefinite period.

SCHWELB, Associate Judge, concurring:

I agree that reversal is required in this case for the reasons stated in the opinion of the court. I write separately, however, to express my disagreement with Chief Judge Rogers' concurring opinion, and especially with Part I thereof.[1]

I

Chief Judge Rogers would hold that the revocation of Plummer's outpatient status was invalid because the Hospital failed to file a timely revocation petition. She takes this position because more than five years ago, on November 6, 1986, the Hospital filed that petition seven days rather than five days after Plummer was returned to inpatient status.[2] The drastic remedy of invalidating the revocation so long after the fact is required, according to the Chief Judge, because the Hospital's timely notice of rehospitalization, the trial court's 1983 commitment order, and language in *In re Richardson,* 481 A.2d 473, 481 (D.C.1984), all required that the revocation petition be filed within five days.[3]

---

1. We must resolve this issue, for if Plummer's contentions with respect to it are correct, it goes to the subject matter jurisdiction of the trial court. Whether that court had subject matter jurisdiction is a threshold issue which we are required to address even when it is presented to us for the first time on appeal. *Eisler v. Stritzler,* 535 F.2d 148, 151 (1st Cir.1976). Indeed, if that question had not been raised at all by the parties, we would be obliged to consider it *sua sponte. Lee v. District of Columbia Bd. of Appeals and Review,* 423 A.2d 210, 215 (D.C.1980). Where a court lacks subject matter jurisdiction, it should so hold, without attempting to resolve the substantive questions presented. *Christianson v. Colt Industries Operating Corp.,* 486 U.S. 800, 818, 108 S.Ct. 2166, 2178, 100 L.Ed.2d 811 (1988). If the trial judge should not have gone beyond the jurisdictional question, then neither should we.

2. Plummer conceded in his brief that weekend days may not be counted and that the Hospital may have been only two days late, rather than four. *See* Chief Judge Rogers' concurring opinion, note 1.

3. *Richardson* is not as clear as it might be on the point. The opinion first states that the patient must be informed that

> the Hospital must either release him after the fifth day of institutional care and observation, *or thereafter* move for a prompt adversary judicial hearing seeking the permanent revocation of his outpatient status.

Plummer, who was represented by a Public Defender Service (PDS) attorney specializing in mental health cases, made no objection in the trial court to the filing of the allegedly untimely petition.[4] Indeed, the issue was not raised by the defense at all until three and a half years later, when PDS submitted its brief in this court.

The Hospital's obligation to file the revocation petition within five days of hospitalization does not appear in the Ervin Act, but is at most a requirement of the case law. Moreover, since a notice of rehospitalization, which automatically triggers the initial judicial review of the legality of the patient's detention, was timely issued, the two-day delay in filing the revocation petition did not prevent prompt review. *See In re Feenster*, 561 A.2d 997, 999 (D.C.1989).[5] According to Chief Judge Rogers, however, these considerations make no difference, because the Hospital's alleged lateness of two days is said to have invalidated all subsequent proceedings in the case. I respectfully but most emphatically disagree.

In general, a party who proposes to raise on appeal an issue which has not been presented to the trial court may do so only upon a showing of circumstances so exceptional that a clear miscarriage of justice would otherwise result. *D.D. v. M.T.*, 550 A.2d 37, 48 (D.C.1988). In the present case, no such showing has been made or even attempted. There is no evidence that the hearing on the revocation petition would have been held sooner if the petition had been filed two days earlier, or that the delay affected Plummer's liberty.

Indeed, if the concept of manifest injustice is implicated at all, it is the Hospital and the community who are threatened by it. If the revocation of outpatient status could be set aside, years after the fact, on grounds initially eschewed but belatedly asserted by the patient, the Hospital would

---

*Id.*, 481 A.2d at 481 (emphasis added). The use of the word "thereafter" suggests that the Hospital has a reasonable time after the expiration of five days to file the petition for revocation. Later in the opinion, however, the court stated that

> [t]he Hospital may detain the patient without a full judicial hearing for a maximum of five days.... [I]f the Hospital determines that further institutionalization is required, it must move for the hearing no later than the fifth day of examination and observation.

*Id.* at 482–83 (footnotes omitted). I assume for present purposes that it is the second passage that controls.

4. Although the three and a half year delay in raising the point makes inquiry into the question difficult, there is good reason to believe that counsel made a tactical decision not to object. Plummer, now approximately thirty-eight years old, had been receiving treatment at various hospitals for paranoid schizophrenia and related disorders, including narcotics abuse, at least since 1974. According to records of prior hospitalizations, he had engaged over the years in bizarre and dangerous conduct, including disrobing in public, attempting to assault a police officer, throwing a knife at his nephew, and threatening his sister. In July, 1986, Plummer was hospitalized after his father reported that he had been lying in the street in front of passing traffic, and police observed him doing the same thing. According to the father, Plummer had failed to take his medication for two months. The danger to him was therefore palpable. *Cf. In re Melton*, 597 A.2d 892, 896–98 (D.C.1991) (en banc).

After Plummer was treated with psychotropic medication, he was released to outpatient status but declined to cooperate with his outpatient regimen or to take his medication. It was for these reasons that Plummer was rehospitalized on October 28, 1986. Under these circumstances, his attorney might well have thought it unwise, from the perspective of Plummer's safety, to insist that his client be released or to make an issue of the filing of the petition two days late, especially since a timely notice of rehospitalization had already been given and prompt judicial review of Plummer's detention was assured. When an objection has been withheld in the trial court for tactical reasons, it may not thereafter be asserted on appeal. *See Hopkins v. United States*, 595 A.2d 995, 996 n. 3 (D.C. 1991).

5. With respect to what triggers what, however, it is interesting to compare the Hospital's brief in *Plummer* with its submission in *Feenster*. In the present case, which centers on the lateness of the revocation petition, the Hospital stated at page 34 of its brief that "[u]nquestionably, it is the notice of rehospitalization, not the petition, that requires a prompt judicial review." In *Feenster*, where it was the notice of rehospitalization that was alleged to be untimely, the Hospital assured this court that "it is the filing of the petition to revoke, the outpatient commitment, not the notice of rehospitalization, which triggers the setting of the adversary judicial hearing required by *Richardson*." Appellee's brief in No. 86–985, at 8. So much for neutral principles of law!

be severely prejudiced. By deferring any allusion to the issue of timeliness until the filing of his brief on appeal, Plummer at least potentially inhibited the ability of the Hospital to explain what occasioned the alleged untimeliness.

Moreover, as a result of counsel's failure to object at the time the petition was filed, there have been numerous subsequent proceedings in the case. These proceedings, which Plummer apparently expects us to treat as null and void, have been costly to the Hospital, and indeed to all concerned, in terms of time, money and effort. Assuming that Plummer's claim of untimeliness is correct on the merits, all of this unnecessary expenditure of effort could have been avoided if a contemporaneous objection had been made. If there was ever a case in which the equities dictate a finding that the point has been waived by a litigant represented by competent counsel, this is surely it.

Chief Judge Rogers asserts that the alleged untimeliness was "jurisdictional." The authorities on which she relies, however, do not support her position. All of them deal with issues of *subject matter jurisdiction.* In *Clay v. Faison,* 583 A.2d 1388, 1390 n. 2 (D.C.1990), the court's remark that "jurisdictional issues may always be raised" related to the *subject matter jurisdiction* of the Family Division of the Superior Court. The passage in 5A C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1393, at 772–73 (2d ed. 1990), to which the Chief Judge also alludes, has to do with the *subject matter jurisdiction* of federal courts. In his dissent in *In re*

*Inquiry into Allegation of Misconduct Against Juveniles Detained at and Committed at Cedar Knoll Institution, Dep't of Human Resources,* 430 A.2d 1087, 1100 (D.C.1981), Judge Ferren remarked that "[t]he parties cannot waive *subject matter jurisdiction.*"

The present defect, if any, does not go to subject matter jurisdiction. The legislature may, of course, make a court's subject matter jurisdiction contingent on timely action on the part of the litigant seeking to invoke it. *See, e.g., Customers Parking, Inc. v. District of Columbia,* 562 A.2d 651, 653–54 (D.C.1989). In this case, however, Plummer points to no statute which purports so to limit the Superior Court's subject matter jurisdiction, and I know of none. Indeed, even the District's elected legislature is precluded from "enact[ing] any act, resolution or rule with respect to any provision of Title 11 (relating to organization and jurisdiction of the District of Columbia courts)." D.C.Code § 1–233(a)(4) (1987); *see also Jones & Artis Constr. Co. v. District of Columbia Contract Appeals Bd.,* 549 A.2d 315, 318 (D.C.1988). Accordingly, I simply do not see how a few words in our decision in *Richardson,* or in prior orders by the trial judge in this case, could divest the Superior Court of subject matter jurisdiction which it previously possessed.[6]

The cases under the Ervin Act on which Chief Judge Rogers relies are all readily distinguishable. In none of them did the court hold that an appellant may raise on appeal an argument that he failed to present below.[7] *See In re Reed,* 571 A.2d

**6.** Generally, in the absence of a statutory provision making subject matter jurisdiction contingent on the timely institution of proceedings, a defense based on lack of timeliness must be properly preserved in the trial court, both in civil and criminal cases. *See, e.g., Mayo v. Mayo,* 508 A.2d 114, 116 (D.C.1986) (statute of limitations is an affirmative defense, and failure to plead it results in its waiver); *Graves v. United States,* 490 A.2d 1086, 1098 (D.C.1984), *cert. denied,* 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986) (prompt assertion of right to speedy trial is a significant factor in determining whether criminal defendant has been denied that right).

**7.** Chief Judge Rogers says that this court's decision in *Feenster,* "made no reference to whether

the patient had contended in the trial court that the Hospital's notification was untimely." An examination of the briefs in *Feenster,* however, reveals that the patient had specifically argued to the trial court in that case that the Hospital was obliged to give his counsel timely notice of rehospitalization, but had failed to do so. *See* Brief for Appellee in No. 86–985, at 10, quoting from page 32 of the *Feenster* transcript. Moreover, "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Thompson v. United States,* 546 A.2d 414, 423 n. 14 (D.C.1988), quoting *Webster v. Fall,* 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411 (1925).

801, 802 (D.C.1990); *In re Feenster, supra,* 561 A.2d at 1000; *In re DeLoatch,* 532 A.2d 1343, 1344 (D.C.1987) (per curiam). Moreover, both *Reed* and *DeLoatch* were grounded on the untimeliness of the petition in light of "plain and clear" *statutory* deadlines. *Reed, supra,* 571 A.2d at 803–04; *DeLoatch, supra,* 532 A.2d at 1345. There is no claim that a statutory deadline has been missed in this case.

In *Feenster,* in which the appellant was held for ten days (rather than for a maximum of twenty-four hours, as required by *Richardson,* 481 A.2d at 480) without *ex parte* judicial consideration of the legality of his detention, the Hospital's failure to file a timely Notice of Rehospitalization led to the denial of timely judicial review. 561 A.2d at 998–99. Here, on the other hand, it is undisputed that the Notice of Rehospitalization was timely filed, and Plummer has made no showing that the alleged lateness by two days of the filing of the revocation petition prejudiced him.

There is nothing in the *Richardson* decision (which as I have noted, is itself less than consistent on the subject, *see* note 3, *supra* ) to suggest that a failure by the Hospital to comply with the five-day directive was intended, without any proof of prejudice, to have the draconian consequences which Plummer now demands. Indeed, since *Richardson,* the Superior Court's Board of Judges has adopted, and this court's Board of Judges has approved, the Superior Court's Mental Health Rule 16(c), which provides in pertinent part:

> If the affidavit [of rehospitalization] indicates that the respondent was involuntarily rehospitalized, the hospital must either release the respondent after the fifth day of inpatient care and observation, or thereafter promptly move, *but no later than ten (10) calendar days from the date of rehospitalization,* for a judicial hearing seeking permanent revocation of the respondent's outpatient commitment.

(Emphasis added.) Obviously, this Rule is not retroactive, but it sheds some light on

the question whether the Hospital's two day delay in this case was a fundamental defect, and therefore "jurisdictional," as Chief Judge Rogers suggests. In any event, I am satisfied that the revocation of Plummer's outpatient status cannot reasonably be invalidated on grounds first raised on appeal three and a half years after the fact.

## II

I also disagree with Chief Judge Rogers' conclusion that the trial judge violated Plummer's rights when he committed him as an inpatient for an indefinite period. The judge predicted that Plummer would be "out of there in eight weeks or a little bit more." The doctor testified that Plummer "needs some more time, at least a couple of months or so." No guarantee was or could be given as to the exact period of time that it would take for the patient's condition to improve sufficiently to permit his release without danger to him or to others.

Reacting in a seasoned and humane manner to this situation, the trial judge ordered Plummer's commitment for an indefinite period, but at the same time set an early review. The propitious scheduling of that review ensured that Plummer would be released to the community if all went as planned. A sympathetic and experienced judge who demonstrated sincere concern for Plummer's liberty interest and welfare adopted what he reasonably regarded as a practical way of handling the problem. We ought not to second-guess him. I discern no failure here to abide by the "least restrictive alternative" principle.

The judge heard the testimony. He observed the witnesses, as well as the patient. I do not think that we can reasonably say from our lofty appellate perch that the judge's decision was "clearly erroneous," or, indeed, erroneous at all. Accordingly, I would not reverse on the ground that the commitment for an indefinite period was illegal.[8]

---

8. In light of my views as expressed in this opinion, I would join Judge Wagner in voting to affirm in Appeal No. 86–FM–1697, in which Plummer challenges the revocation of his outpa-

WAGNER, Associate Judge, dissenting:

Essentially for the reasons stated in Judge Schwelb's opinion, I agree that the trial court did not err in revoking appellant's outpatient commitment and committing him for inpatient care. (Appeal No. 86-1697). In my opinion, the Hospital's failure to comply strictly with the time limits specified in the civil commitment order does not invalidate the court's determination, after hearing, that appellant's condition required inpatient treatment. No statutory deadlines were violated in this case which would provide a basis for an independent judicial determination of the need for appellant's involuntary hospitalization to remedy legal imperfections in the revocation proceedings. *See In re Reed,* 571 A.2d 801, 803 (D.C.1990).

Moreover, the procedures set out in *In re Richardson,* 481 A.2d 473 (D.C.1984) were not violated. A careful reading of *Richardson* reveals its holding to be "that a trial court may authorize an outpatient's summary rehospitalization in certain situations, provided the patient is detained only temporarily and the Hospital complies with the affidavit and notice requirements set out in Part II [of the opinion]." 481 A.2d at 483-84. The requirements specified in Part II of the opinion are that the Hospital provide: (1) the court and appellant's counsel with an affidavit within twenty-four hours reciting facts from which the court can find affirmatively that the Hospital's action in returning the patient for temporary treatment is supported by probable cause; and (2) written notice to the patient and counsel "that the Hospital must either release him after the fifth day of institutional care and observation, or thereafter move for a prompt adversary judicial hearing seeking the permanent revocation of his outpatient status." *Id.* at 480-81. Aside from the "narrow issue" which the

court stated was before it,[9] *Richardson* was concerned with minimizing the risk of erroneous rehospitalization by assuring some procedure for prompt judicial review. Appellant was accorded what *Richardson* requires. I do not read *Richardson* to mandate more than that the petition for revocation be filed promptly. Due process does not require the precise deadlines which appellant requests that this court judicially impose. Moreover, the Hospital's delay of two days in filing the petition in this case can be regarded only as a minimal procedural deficiency which does not so infringe upon appellant's due process interests as to require invalidation of the hearing on the petition for revocation. *See In re Rosell,* 547 A.2d 180, 182 (D.C.1988). Due process does not require perfection. Therefore, I agree with the opinion of Judge Schwelb that no manifest injustice occurred here which requires the court's consideration of an issue raised for the first time on appeal.

I also agree with Judge Schwelb that an indefinite commitment under the circumstances is not inconsistent with the "least restrictive alternative." A trial judge faced with a patient truly mentally ill, dangerous to himself and others and requiring hospitalization as the least restrictive alternative is confronted with a situation which may or may not change. The factual basis for the court's conclusions were established by the evidence. The trial court was not required to enter a temporary order given future uncertainties. Although the inpatient commitment was indefinite, the trial court ordered a report and review of the case in two and a half months. The order assured immediate hospitalization as necessitated by Mr. Plummer's condition and an early review to address changed circumstances. In my opinion, the order is consistent with the "least restrictive alterna-

---

tient status and his indefinite inpatient commitment, if I thought that that appeal were still alive. Indeed, Judge Wagner and I form a majority on the merits (or lack thereof) of Appeal No. 86-FM-1697. Since Chief Judge Rogers and I—a majority of the division—have both voted to return Plummer to outpatient status, however, I agree with the Chief Judge that No. 86-FM-1697 is technically moot.

**9.** "The narrow issue here is whether the commitment order may authorize the patient's summary return to the Hospital for a brief period of reevaluation and treatment in the event his condition deteriorates or he fails to comply with the terms of the outpatient treatment program." *Richardson, supra,* 481 A.2d at 479.

tive" requirement. *See Richardson, supra*, 481 A.2d at 479.

I respectfully dissent from the decision of the court reversing two orders of the trial court with instructions that appellant's outpatient commitment be restored. In my view, the records in the cases which the court reverses do not support the relief granted. Although I agree generally that a committed inpatient placed on indefinite leave by the Hospital for a lengthy period acquires a conditional liberty interest which triggers due process safeguards, I discern no violation of the minimum procedural protections in the proceedings which resulted in the orders the court reverses. Moreover, the mandate of the court extends beyond what is reasonably necessary to address any perceived procedural deficiencies. It requires that a lawfully committed inpatient be restored to outpatient status without the benefit of a medical assessment of the patient's condition and the treatment warranted for the patient's care. If the case is remanded, it should be left to the trial court, after development of an evidentiary record, to fashion an order consistent with appellant's treatment needs, giving due consideration to the interest of the patient and the public. *See Richardson, supra*, 481 A.2d at 479.

A brief examination of the proceedings which resulted in each of the orders reversed by the court dispels the conclusion that appellant's due process rights were violated in the trial court in appeal Nos. 87–1239 and 87–1423. In appeal No. 87–1239, appellant challenges the trial court's denial of relief under Super.Ct.Civ.R. 60(b). Our standard of review of the trial court's decision is abuse of discretion, and "we do not review or determine the merits of the underlying action." *State Farm Mutual Automobile Insurance Co. v. Brown*, 593 A.2d 184, 185 (D.C.1991). Applying that standard, in my view, the trial court did not abuse its discretion in denying the motion. The trial court entered the order revoking Mr. Plummer's outpatient status and imposing an inpatient commitment order on December 11, 1986. Not until February 18, 1987 was Mr. Plummer placed on convalescent leave from the Hospital. The motion for relief from the court's order was filed on May 27, 1987, just three months later. The Hospital opposed the motion and submitted the affidavit of Mr. Plummer's treating psychiatrist, Dr. Francine Schwartz. That affidavit revealed that Mr. Plummer had complied only minimally with the treatment plan, that he had no increased insight into his mental illness and that the nature and severity of his condition required further hospitalization and a long period of recuperation. Appellant submitted no opposing evidence.

Nor does the fact that appellant had been first on temporary leave, then convalescent leave, undermine the court's determination that no modification of the prior order was warranted. This court has observed that "[o]utpatient release is a therapeutic strategy long recognized as effective in treating mental illness." *Richardson, supra*, 481 A.2d at 477 n. 2 (citations omitted). Considering that the court had before it evidence presented by the hospital, the absence of contrary evidence by appellant, the recent evidentiary hearing and order for inpatient treatment, and the knowledge that convalescent leave is a part of that treatment program, there is no basis to conclude that the trial court abused its discretion in denying the request for relief under Rule 60(b). Therefore, in my view, the order in appeal No. 87–1239 should be affirmed.

The second order which the court reverses in appeal No. 87–1423 arises out of an application by the Hospital for appellant's return to the Hospital pursuant to D.C.Code § 21–592 (1989).[10] That section of the Code provides:

> [w]hen a person has been ordered confined in a hospital or institution for the mentally ill pursuant to this chapter and has left such hospital or institution without authorization or has failed to return

---

10. This request was the first in a series of three requests which resulted in two other appeals, Nos. 88–642 and 88–1565.

as directed, the court which ordered confinement shall, upon the request of the administrator of such hospital or institution, order the return of such person to such hospital or institution.

In this proceeding the Hospital filed an application and provided appellant's counsel with a copy. The application was supported by a letter from appellant's treating physician reporting that appellant had failed to report for an appointment or to obtain the medication necessary to control his illness. It was only after a hearing at which appellant presented oral argument in support of his position that the court finally entered an order on October 27, 1987 returning appellant to the Hospital pursuant to D.C.Code § 21–592 (1989).[11] The court's order directed appellant's return to the Hospital and denied appellant's request that upon rehospitalization he be afforded the rights set forth in *Richardson.*

Since appellant was a legally committed inpatient at the time of the application, the Hospital was authorized to apply for his return provided the conditions in D.C.Code § 21–592 were met. In fact, appellant was given notice, and the hearing was held before the order was entered and before appellant was actually returned to the Hospital. Under the circumstances, I find no basis to conclude that the essential requirements of due process were not met in this case. *See Matthews v. Elridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976); *see also In re Mills,* 467 A.2d 971, 976 (D.C.1983). Therefore, I am unable to agree that the order should be vacated and appellant's outpatient status reinstated in appeal No. 87–1423.

On the other hand, it cannot be said that the minimal requirements of due process were accorded appellant in the case which resulted in appeal No. 88–642.[12] In that case appellant was not provided with notice of the government's application to return him to the Hospital pursuant to D.C.Code § 21–592 (1989). Appellant was not afforded an opportunity to contest even whether the statutory criteria for issuance of the section 592 order had been met. Additionally, appellant's status as an inpatient on indefinite convalescent leave gave rise to a conditional liberty interest which required at a minimum prompt notice and an opportunity to be heard on the application at the earliest time possible. *See Richardson, supra,* 481 A.2d at 481; see also *In re Commitment of B.H.,* 212 N.J.Super. 145, 514 A.2d 85, 89–90 (N.J.L.1986). It is beyond our judicial function to mandate precise procedures to be followed in such cases, and we should not do so here. *See Birl v. Wallis,* 619 F.Supp. 481, 493 (D.Ala. 1985). However, notice is such a fundamental safeguard that it is readily apparent that appellant was denied minimal required protections in the case out of which appeal No. 88–642 arose. If appellant were still hospitalized pursuant to the order appealed from, a remand would be warranted. However, in my view, justice can be served by simply vacating the order in appeal No. 88–642. *See Friend v. United States,* 128 U.S.App.D.C. 323, 326, 388 F.2d 579, 582 (1967).[13]

---

**11.** The Hospital represents that although an order for Mr. Plummer's return to the Hospital was entered initially on September 17, 1987, it was never docketed or mailed to the parties. Mr. Plummer was not hospitalized until July 23, 1988 pursuant to a later order issued on May 2, 1988.

**12.** This is one of the appeals dismissed by the court as moot. Since I dissent from the decision of the Court reversing two orders of the trial court (Appeal Nos. 87–1239 and 87–1423) with instructions to restore appellant's outpatient commitment, I must also respectfully disagree with its decision to dismiss appeal No. 88–642, which is based on the disposition of those two appeals. *See ante,* p. 751 n. 7. Accordingly, it is my view that appeal No. 88–642 should be addressed under the mootness exception. *See In re W.L.,* 603 A.2d 839, 841 (D.C.1991); *see also United States v. Edwards,* 430 A.2d 1321, 1324 n. 2 (D.C.1981).

**13.** The trial court dismissed appellant's petition for *"Richardson"* rights with respect to a later section 592 application out of which appeal No. 88–1565 arises. The dismissal by the trial court was based on lack of jurisdiction because the

same issues were pending on appeal in the other cases. In view of that fact, and since this court restores appellant's outpatient status and dismisses appeal No. 88–1565, I do not address it.