# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-FM-0003

IN RE S.W., APPELLANT.

Appeal from the Superior Court
of the District of Columbia
(2020-MHE-001799)

(Hon. Peter A. Krauthamer, Trial Judge)

(Submitted October 4, 2022                    Decided July 3, 2024[*])

*Joel R. Davidson* for appellant.

*Karl A. Racine,* Attorney General for the District of Columbia at the time with whom *Caroline S. Van Zile,* Solicitor General, *Ashwin P. Phatak,* Principal Deputy Solicitor General, *Holly M. Johnson,* Senior Assistant Attorney General, *Ethan P. Fallon,* Assistant Attorney General, were on the brief for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and BECKWITH and HOWARD, *Associate Judges*.

HOWARD, *Associate Judge*:  Appellant S.W. appeals from the trial court's order of inpatient commitment, asking us "to reverse the decision of the trial [j]udge finding that continued secure inpatient hospitalization at Saint Elizabeth[s] [Hospital] was the least restrictive placement that would protect [S.W.] and the community."  We affirm.

---

[*] The decision in this case was originally issued as an unpublished Memorandum Opinion and Judgment.  It is now being published upon the court's grant of appellee's motion to publish.

## I.    Background

On September 16, 2020, the District of Columbia petitioned for S.W.'s civil commitment for one year.  After a hearing on March 18, 2021, the D.C. Commission on Mental Health issued a recommendation for a one-year inpatient commitment. Thereafter, through appointed counsel, S.W. challenged the recommendation and a one-day bench trial was held on December 16, 2021.  At the close of the hearing the trial court found: (1) that the District had established by clear and convincing evidence that S.W. "suffers from mental illness" (specifically, schizoaffective disorder); (2) that she was "making . . . health decisions, medical decisions that are not in her best interest"; (3) that "at times, she can be physically agitated and violent"; (4) that she "does pose a danger to others"; and (5) that "since she's been hospitalized and been medicated, her behavior has improved[.]"  The trial court cited testimony by psychiatrist Dr. Andrew Schwartz that S.W. "was unlikely to maintain herself in a non-therapeutic environment, and without the constraints of the therapeutic environment such as the hospital, she deteriorates, decompensates, and becomes disorganized and violent."  The trial court specifically credited Dr. Schwartz's testimony that if S.W. "were not to be in the hospital setting, she would become dangerous, and violent, and aggressive towards others, and therefore would be a danger to others."

Additionally, the trial court found "based on all the evidence" that S.W. must remain at St. Elizabeths, but it expressed hope that "at some point" S.W. will "be eligible to be discharged to a nursing home, and then a nursing home will accept her based on her improved behavior at St. Elizabeths."[2]  This appeal followed.

## II.  Discussion

For the trial court to involuntarily commit someone under the "Hospitalization of Persons with Mental Illness Act," D.C. Code §§ 21-501-592, often called the "Ervin Act," *see, e.g., In re Macklin*, 286 A.3d 547, 550 (D.C. 2022), the government must demonstrate that (1) "the person is mentally ill," (2) "because of that mental illness, [she] is likely to injure h[er]self or others if not committed," and (3) there is no "[less] restrictive alternative [to commitment] consistent with the best interests of the person and the public."  D.C. Code § 21-545(b)(2).

"The showing on the first two prongs must be made by clear and convincing evidence."  *In re D.D.*, 303 A.3d 935, 940-41 (D.C. 2023) (quoting *In re Gaskins*,

---

[2]  The trial court's written order committing S.W. for inpatient treatment for a period of one year directs the Department of Behavioral Health to report to the trial court its discharge efforts and directs that if S.W. "should be discharged from inpatient treatment to participate in an outpatient course of treatment, [S.W.] shall report for treatment at any outpatient facility or at any other program, at such times and dates and places as directed by the treating psychiatrist, psychologist, and/or case manager; shall take prescribed medication(s); and shall participate in any treatment regimen required by outpatient treatment staff[.]"

265 A.3d 997, 1001 (D.C. 2021) (citing *Addington v. Texas*, 441 U.S. 418, 425-26 (1979))). However, "the trial court need not apply the clear and convincing evidence standard in determining the least restrictive form of treatment." *In re Gaither*, 626 A.2d 920, 925 (D.C. 1993). Rather, "[a]s to the statutory requirement that the court order the form of commitment it believes is the least restrictive alternative consistent with the best interests of the person and the public, . . . we will not disturb the trial court's determination unless it was 'plainly wrong or without evidence to support it.'" *D.D.*, 303 A.3d at 941 (quoting D.C. Code § 17-305(a)) (other citations and quotation marks omitted).

We therefore look to "whether there is any substantial evidence which will support the conclusion reached by the trier of fact below." *Id.* (quoting *In re Gaskins*, 265 A.3d 997, 1001 (D.C. 2021)). We "view the evidence in the light most favorable to the government and give full weight to the factfinder's ability to weigh the evidence, determine the credibility of witnesses, and draw justifiable inferences." *Id.*

In determining the least restrictive alternative, the trial court is not limited "to a polarized choice between indefinite hospitalization and unconditional release[.]" *D.D.*, 303 A.3d at 943 (quoting *In re Mills*, 467 A.2d 971, 974-75 (D.C. 1983)). Rather, the statutory scheme "makes the entire spectrum of services . . .

available, including outpatient treatment, foster care, halfway houses, day hospitals, nursing homes, and others." *In re Stokes*, 546 A.2d 356, 360 (D.C. 1988); *see also In re Plummer*, 608 A.2d 741, 749 (D.C. 1992) (Rogers, C.J., concurring) (explaining that the statutory scheme "has been construed to impose a duty upon the courts to explore alternatives both *within* the mental hospital . . . and *outside* the hospital, . . . and to require that the courts select the least restrictive alternative which would serve the purposes of the commitment." (alterations in original) (quoting *Mills*, 467 A.2d at 974-75)).

On appeal S.W. does not present arguments challenging the determination that she is mentally ill or the finding that she poses a danger to others because of her mental illness.[3] Instead, she acknowledges that "Dr. Schwartz was qualified to testify [as he did] about the danger [a]ppellant might pose if her mental illness was left untreated." Instead, S.W. argues that the evidence was insufficient to permit the

---

[3] S.W.'s statement of the "Issues Presented" does ask "[w]hether the evidence presented at trial in this case was sufficient to support the finding by the trial Judge that Appellant was suffering from a mental illness and that as a result she posed a danger of harm to herself or others." However, as we have admonished, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *Comford v. United States*, 947 A.2d 1181, 1188 (D.C. 2008).

trial court "to find by clear and convincing evidence that secure inpatient hospitalization . . . was the least restrictive placement[.]" More specifically, she argues that the District "presented no reliable evidence that [she] could not be placed in a nursing home environment without creating a danger to herself or others."

We are unpersuaded by appellant's argument that the evidence was insufficient to support the trial court's determination that St. Elizabeths was the least restrictive placement suitable for S.W.[4] To begin with, as discussed above, the trial court was not required to find by clear and convincing evidence that inpatient hospitalization was the least restrictive placement for her. "[T]he trial court need not apply the clear and convincing evidence standard in determining the least restrictive form of treatment" as the law "places no particular evidentiary burden on" the party seeking commitment. *Gaither*, 626 A.2d at 925. Ultimately, a reversal is

---

[4] Given the timing of the series of events in this case, we have considered whether this matter is moot because the December 16, 2021, order that S.W. be committed for a period of one-year is now expired. As we have recently acknowledged in *D.D.*, "the one-year limitation on the length of commitment orders, *see* D.C. Code § 21-545(b)(2), means that [such an order is] in its duration too short to be fully litigated prior to its cessation or expiration" and thus is "capable of repetition yet evading review," rendering a challenge to such order not moot. *D.D.*, 303 A.3d at 937 n.4 (internal quotation marks and citations omitted).We also have observed—in explaining why an appeal from an involuntary civil commitment generally is not moot—that such a final order "on the ground of mental illness and dangerousness imposes significant and continuing collateral consequences on the patient long after the expiration of the commitment." *In re Amey*, 40 A.3d 902, 909 (D.C. 2012).

not warranted where the court's decision is "abundantly supported by the evidence," as was the case here. Further, the record evidence provided ample support for the trial court's conclusion. Dr. Schwartz testified that S.W., whom he opined has a "major psychiatric" condition most closely fitting "the rubric of schizoaffective disorder," "at times . . . becomes physically quite agitated and threatening and . . . at times, physically violent." Dr. Schwartz testified to S.W.'s history, including incidents of her refusing to take medication, becoming violent, voicing claims that are "extremely unlikely [and] at wide divergence from reality," such as then-recent claims about an animal chained in her room, and responding to such beliefs with violence, including an attempt to push a roommate down the stairs when trying to run away from the group home.

He further testified that even though S.W. was voluntarily taking the medicine prescribed for her mental illness at the time of trial, "her refusal to take medication regularly has been a hallmark of her clinical course for many, many months, even years," and that it was "very likely that she would not willingly take psychiatric medication" if she were discharged from the hospital. Dr. Schwartz testified that S.W. "doesn't function well when not treated psychopharmacologically" and that S.W. "doesn't do well" without psychopharmacologic and psychological supports. He testified that S.W. "needs inpatient hospitalization" because an inpatient hospital

setting is where "she's more likely to receive the kind of treatment that she needs" to avoid becoming "horribly disorganized, and extremely upset, and even violent."

He opined specifically that inpatient hospitalization is the least restrictive setting for S.W. because without it she was "unlikely to maintain herself in a therapeutically helpful environment." Dr. Schwartz testified that with her inpatient treatment at St. Elizabeths, S.W. was "creeping forward in the right direction" and opined that it would be "tragic" to interrupt that progress.

S.W. contends that (1) Dr. Schwartz was not an expert in "the treatment modalities available in various nursing home settings" and (2) the District called no witnesses who were knowledgeable about the "level of [] psychiatric care [a]ppellant could expect if she was placed in such a facility," including "whether available nursing homes had trained psychiatrists on staff to administer psychotropic medications and engage [S.W.] in psychotherapy."

Even if we take these points as true, we must also take into account the testimony that the trial court heard from Joseph C. Melendez, a social worker at St. Elizabeths, who explained that he begins "discharge planning . . . from the very first moment the person is admitted to the hospital" and that, since February 2021, he had been submitting active applications to nursing homes to find a placement for S.W. He testified that S.W.'s treatment team had agreed that a placement with 24-hour

care would be the least restrictive setting based on S.W.'s medical and psychiatric needs. All told, Mr. Melendez had submitted "roughly" 75 applications to place S.W., all of which had resulted in denials for different reasons, including lack of an available bed and "not being able to accommodate the patient" because of concern about her "psychiatric behaviors."

We are satisfied that, taken together, Dr. Schwartz's testimony about S.W.'s psychiatric need for an inpatient placement and Mr. Melendez's testimony about his multiple unsuccessful efforts to find a 24-hour-care nursing home placement for S.W. were a sufficient evidentiary basis for the trial court to determine that inpatient hospitalization at St. Elizabeths was the least restrictive placement for S.W.

We note that the scenario in this case presents differently from that of *In re D.D.*, in which we held that the trial court and the District had not "adequately explore[d] less restrictive alternatives to the inpatient commitment of D.D." 303 A.3d at 936. We noted that D.D.'s treating psychiatrist "had initially recommended her commitment to outpatient treatment" but had modified his position—while still agreeing outpatient treatment options "could be explored"—because he believed that D.D. may not receive proper care and medication administration if she was discharged into the community or to a nursing home. *Id.* at 943. On that evidence, we reasoned that "neither the District's nor the trial court's exploration of possible

alternatives to inpatient hospitalization for D.D. appear[ed] to have been particularly searching." *Id.*

Though there are similarities between the current case and *In re D.D.*, the differences here lead us to affirm the decision of the trial court that St. Elizabeths is the least restrictive placement option, and to affirm the decision of the trial court. D.D. and S.W. exhibited similar conduct and needs–both (1) experienced psychotic delusions and verbally harassed others while at St. Elizabeths, (2) resisted their medication, (3) expressed that they do not want to go to a nursing home, and (4) needed inpatient treatment, per testimony in the separate cases. *In re D.D.*, 303 A.3d at 937-38, 943. However, this case differs from *D.D.* on two major points: In *D.D.*, (1) the psychiatrist believed that nursing homes may not provide D.D. with necessary care, including giving her injections, and (2) psychiatrists considered that D.D.'s symptoms could stem from another condition. *Id.* at 943. Here, instead, (1) there is no available facility that can provide the 24-hour care that S.W. needs and (2) there is no argument that S.W.'s symptoms could stem from another condition. S.W.'s treatment team made extensive efforts to discharge and place her in a nursing home: roughly 75 alternative facilities were explored, and each resulted in a denied application.

Extensive efforts to place S.W. in a nursing home failed based on her documented history or availability of the nursing homes. Thus, this case differs from *In re D.D.* in that it is all the more clear that St. Elizabeths is the least restrictive alternative to in-patient commitment for S.W.

### III. Conclusion

For the foregoing reasons, the trial court's order committing S.W. to St. Elizabeths Hospital for a period of one year is affirmed.

*So ordered.*